USCA Case #15-1416     Document #1583818     Filed: 11/13/2015     Page 1 of 60

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

NOV 13 2015

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    NOV 13 2015

CLERK

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

TIMBERVEST, LLC, JOEL BARTH
SHAPIRO, WALTER WILLIAM
ANTHONY BODEN, III, DONALD
DAVID ZELL, JR., and GORDON
JONES II,

        Petitioners,

        v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 15-15-1416 _____

Petition for Review

ORIGINAL

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 15 U.S.C. § 78y, and Federal Rule of Appellate

Procedure 15(a), Timbervest, LLC, Joel Barth Shapiro, Walter William Anthony

Boden, III, Donald David Zell, Jr., and Gordon Jones II (collectively "Petitioners")

hereby petition this Court for review of the final decision  and order of the United

States Securities and Exchange Commission (the "Commission"), captioned *In the*

*Matter of Timbervest, LLC, et al.*, Opinion of the Commission, Admin. Proc. File

No. 3-15519 (September 17, 2015) ("Decision"). Petitioners seek review of all

aspects of the Decision, except for the portion concerning disgorgement of the

Kentucky property disposition fee. Petitioners also petition this Court for review of

the Commission's Order Imposing Remedial Sanctions, Admin. Proc. File No. 3-

15519 ( September 17, 2015) ("Order").    Petitioners attach the Decision and Order

as Exhibits A and B to this petition.

Dated: November 13, 2015


Stephen D. Councill
Julia Blackburn Stone

ROGERS & HARDIN LLP
2700 International Tower, Peachtree
Center
229 Peachtree Street, N.E.
Atlanta, GA 30303
Telephone: 404-522-4700
Facsimile: 404-525-2224
scouncill@rh-law.com
jstone@rh-law.com

*Counsel for Petitioners*

Nancy R. Grunberg
George Kostolampros

DENTONS US LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: 202-496-7524
Facsimile: 202-496-7756
nancy.grunberg@dentons.com
george.kostolamproas@dentons.com

*Counsel for Petitioners*

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

INVESTMENT ADVISERS ACT OF 1940
Release No. 4197 / September 17, 2015

INVESTMENT COMPANY ACT OF 1940
Release No. 31830 / September 17, 2015

Admin. Proc. File No. 3-15519

In the Matter of

TIMBERVEST, LLC,
JOEL BARTH SHAPIRO,
WALTER WILLIAM ANTHONY BODEN, III,
DONALD DAVID ZELL, JR., and
GORDON JONES II

OPINION OF THE COMMISSION

CEASE-AND-DESIST PROCEEDING

INVESTMENT ADVISER PROCEEDING

INVESTMENT COMPANY PROCEEDING

*Grounds for Remedial Action*

Antifraud Violations

Registered investment adviser committed fraud by making material misrepresentations and omissions, and its principals aided, abetted, and caused the violations. *Held*, it is in the public interest that the registered investment adviser and its principals (collectively, Respondents) be ordered to cease and desist from further violations of the securities laws; that the principals be barred from associating with any investment adviser; and that Respondents be ordered to disgorge, jointly and severally, $403,500 plus prejudgment interest.

APPEARANCES

*Stephen D. Councill* and *Julia Blackburn Stone* of Rogers and Hardin, LLP, and *Nancy R. Grunberg* and *George Kostolarnpros* of McKenna Long & Aldridge LLP, for Respondents.

2

*Andrew J. Ceresney*, *M. Graham Loomis*, *Robert K. Gordon*, *Anthony J. Winter*, and *David S. Mendel*, for the Division of Enforcement.

Appeal filed:          September 10, 2014
Last brief received:   February 23, 2015
Oral Argument:         June 8, 2015

## I.      Introduction[*]

Respondents Timbervest, LLC, Joel Barth Shapiro, Walter William Anthony Boden, III, Donald David Zell, Jr., and Gordon Jones II appeal from an administrative law judge's initial decision finding that Timbervest, a registered investment adviser, violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, and that Timbervest's four principals aided, abetted, and caused those violations.[1]  The Division of Enforcement has also petitioned for review of certain aspects of the administrative law judge's initial decision regarding the liability determination as to Jones and Zell, and the imposition of an associational bar.  Based on our independent, *de novo* review of the record, we find that Timbervest orchestrated a transaction to sell the property of one of its clients to another client at a below-market rate, to the detriment of the original client.  We find that Timbervest violated the Advisers Act by failing to disclose its conflict of interest in this transaction.  Additionally, we find that Timbervest violated the Advisers Act by causing its client to pay brokerage commissions that Timbervest did not disclose.  We also find that Shapiro, Boden, Zell, and Jones aided, abetted, and caused Timbervest's misconduct.

For the reasons that we explain herein, the Respondents are ordered to cease and desist from further violations of the securities laws and to disgorge, jointly and severally, $403,500 plus prejudgment interest.  Further, we find that it is in the public interest that the four individual Respondents be permanently barred from associating with any investment adviser.

Finally, we reject Respondents' challenges to the constitutionality of the Commission's administrative forum.  Specifically, we find that:  (1) Commission administrative law judges are not "inferior officers" covered by the Appointments Clause of the U.S. Constitution;[2] (2) the two layers of tenure protection that ALJs enjoy do not unconstitutionally impede the President's ability to "take Care that the Laws be faithfully executed";[3] and (3) the decision to file this

---

[*]      Unless the context indicates otherwise, any factual statements that are quoted in this decision are witness testimony from the hearing.

[1]      *In the Matter of Timbervest, LLC, et al.*, Initial Decision Release No. 658, 2014 WL 4090371 (Aug. 20, 2014).

[2]      *See* U.S. Const. art. II, § 2, cl. 2.

[3]      *Id.* art. II, § 3.

enforcement matter in the administrative forum as opposed to federal court did not violate Respondents' Fifth Amendment right to equal protection of the laws.

## II.     Background

### A.     Respondents

Respondent Timbervest is a registered investment adviser headquartered in Atlanta, Georgia.[4]  Its clients include institutions that invest through various investment funds that are managed by Timbervest and that generally invest in the timber industry.  Among other things, Timbervest manages the timberland owned by these funds and generally controls the acquisition and disposition of timberland on the funds' behalf.  Throughout the period relevant to this case, Timbervest was owned and controlled by Respondents Shapiro, Boden, Zell, and Jones (collectively "the Timbervest partners"), each of whom served on Timbervest's investment committee, which made all decisions regarding the acquisition, disposition, and valuation of timberland property.  As Shapiro testified, "all purchase and sale decisions need[ed] to be unanimously agreed to by the investment committee" before the transaction could be completed.

Shapiro, who joined Timbervest in 2002, was Timbervest's Chief Executive Officer. He had previously been affiliated with various broker-dealers and investment advisers, and has held several securities licenses including a Series-65 registered investment adviser license.

Boden began as a consultant to Timbervest in late 2002 and became its Chief Investment Officer in 2004.  Throughout the relevant period, he was a licensed real estate salesperson in Georgia.

Zell worked as an investment manager in the pension group of BellSouth, which (through three BellSouth pension plans) wholly owned an investment vehicle (New Forestry, LLC) that Timbervest managed prior to and during the period of the violations.  While at BellSouth, Zell had responsibility for overseeing the New Forestry investment and for dealing with Timbervest in its capacity as BellSouth's investment adviser.  He joined Timbervest from BellSouth in 2003 and became Timbervest's Chief Financial Officer in March 2004.

Jones, who joined Timbervest in January 2004, was Timbervest's President, General Counsel, and Chief Compliance Officer.  Before joining Timbervest, he practiced corporate law and commercial finance as a partner in an Atlanta law firm.

### B.     New Forestry and TVP-1

In January 2005, the four individual Respondents acquired 100 percent ownership of Timbervest.[5]  Although they acquired Timbervest through a wholly owned holding company in

---

[4]     Timbervest is a relatively small entity.  During the relevant 2006-2007 period, there were only "15 people in the company."

[5]     In December 2013, Jones sold his interest in Timbervest to Shapiro, though he remains involved with the management of the company.

4

which they each owned 25 percent, they managed Timbervest together as though it were a partnership. As Boden testified, they "worked in close proximity for years," they "buil[t] the business together," "all four of [them] were intimately involved in what [they] were doing," and they "invested in our timberland funds on an equal prorated basis."

In acquiring Timbervest, Shapiro, Boden, Zell, and Jones collectively took on $1.7 million in loans to purchase a private equity firm's controlling interest. The four partners had to personally guarantee those loans, and as Jones testified, they "extended [themselves] in buying the company."

At that time, Timbervest's principal revenue source was from its investment advisory relationship with its client BellSouth, specifically the management fees that Timbervest received from managing BellSouth's New Forestry investment vehicle.[6] These management fees were calculated as a percentage of the value of BellSouth's assets held in the New Forestry portfolio. A few months after the partners took control of Timbervest, BellSouth directed the partners to begin a process of reducing New Forestry's portfolio by half—from approximately $471 million to $200-$250 million. At the same time, BellSouth "dramatically" and immediately lowered Timbervest's management fees for all portfolio assets in excess of $250 million.[7]

At around the same time, Timbervest was working to establish a series of new funds—the first of which was Timbervest Partners, LLC ("TVP-1"). TVP-1 had a particular structure that gave Timbervest a significant interest in the success of the fund's investments. Known as a "commingled fund," it was a "pooled vehicle in a limited liability format where [a Timbervest subsidiary] served as a general partner" and it was comprised "of investments made by either institutional investors, high net worth investors and the like that pool their capital into [the fund]." Each of the four Timbervest partners invested in this commingled fund.

------

[6] BellSouth exercised ultimate control over the New Forestry investment portfolio, including requiring Timbervest to report to BellSouth, unilaterally modifying BellSouth's compensation level for managing the portfolio, determining the character of the investments in New Forestry, and eventually terminating Timbervest's management of the New Forestry portfolio. Respondents recognized that BellSouth was the actual investment advisory client. For example, Boden testified that BellSouth was a "client" and that Timbervest "manage[d]" New Forestry for BellSouth "specifically according to their ... strategy that they espoused and the timeline that they wanted and it was a direct relationship." Similarly, Jones admitted during the hearing that "Timbervest had a fiduciary duty that it owed to BellSouth."

[7] In an effort to incentivize Timbervest to implement the portfolio reduction, BellSouth provided that Timbervest could receive a one-time disposition fee of 3 percent of the gross sales price of any timberlands where the gross sales price was at least 90 percent of the fair market value of the property. As we will discuss later, this disposition fee is the subject of the Division's disgorgement requests.

5

## C.    The Sale and Repurchase of the Tenneco Core Property

Although it faced a decline in revenue from BellSouth, Timbervest stood to gain if it could make the new TVP-1 fund a success.[8]  Timbervest soon engaged in a fraudulent transaction that involved both of those funds.

Toward the end of 2006, Timbervest sold a large parcel of timberland out of New Forestry.  That parcel was known as "Tenneco Core."  Timbervest "had discretion to sell any property in New Forestry's portfolio" without obtaining permission from BellSouth or anyone else.  The buyer, Charles Wooddall, had known Boden since "the 90s" and had been actively buying and selling timberland since 1998.  In a transaction that closed on October 17, 2006, Timbervest sold Tenneco Core on BellSouth's behalf to Wooddall's company, Chen Timber, for $13.45 million.

But Wooddall did not keep the property for long.  Just six weeks later, on November 30, 2006, Boden sent Wooddall a written agreement to repurchase the property on behalf of Timbervest's new fund, TVP-1.  The parties executed this transaction on December 15, 2006, and the sale closed on February 1, 2007.  Timbervest paid $14.5 million to repurchase the property from Wooddall, and it valued the property on TVP-1's books at $15.7 million.  BellSouth was never told about the sale-and-repurchase arrangement with Wooddall.

## D.    The Brokerage Commissions on the Tenneco Core and Kentucky Property Transactions

Timbervest's investment management agreement did not provide for real estate brokerage commissions to be paid to Timbervest or the other Respondents, nor did any other written agreement authorize such payments.  But when Timbervest sold the Tenneco Core property to Wooddall, the sales contract included a 3 percent real estate commission to be paid to "Fairfax Realty Advisers LLC."  Similarly, when Timbervest sold a BellSouth property in Kentucky in 2007, the contract for that sale required a 2.5 percent commission to be paid to "Westfield Realty Partners, LLC."

Although Fairfax Realty and Westfield Realty appeared to be bona fide real estate brokers, they were in fact—unbeknownst to BellSouth—shell companies that served to funnel the brokerage commissions back to the Timbervest partners.  These companies had no assets, business plan, operating agreement, bank account, or employees, and they were not licensed real estate brokers.  Rather, they were set up, at Boden's request, by Boden's personal attorney and "very good friend," Ralph Harrison.  They were registered with the state of Georgia under Harrison's name, each using a different address at a private mailbox company (*e.g.*, the UPS Store).

---

[8]    Jones testified that, notwithstanding the efforts to establish the new funds, in 2006 and 2007 "most of Timbervest's revenues came from its relationship with New Forestry[.]"  Tr. 1510.

After the Tenneco Core sale to Wooddall closed in 2006, Boden received a $470,450 check for the real estate commission made out to Fairfax Realty. He gave the check to Harrison, who deposited it in his IOLTA attorney trust account; Harrison, after deducting a 10 percent contingency fee for himself, then wrote a $423,000 check from the trust account to WAB, Inc., an entity owned and controlled by Boden; Boden then divided the $423,000 four ways, keeping a quarter for himself and paying approximately $105,000 to each of the three other Timbervest partners using cashier's checks. Essentially the same process was followed to funnel Westfield Realty's $684,486 commission back to Harrison and the four Timbervest partners.[9]

### III. Discussion

We find that Timbervest, acting with scienter, violated Sections 206(1) and 206(2) of the Advisers Act by failing to disclose to BellSouth its secret sale-and-repurchase arrangement for the Tenneco Core property.[10] We find that Timbervest also violated Sections 206(1) and 206(2) with scienter by imposing undisclosed brokerage commissions on the Tenneco Core transaction and Kentucky property transactions. We further find that the four Timbervest partners aided, abetted, and caused Timbervest's violations.

**A.    Timbervest violated Sections 206(1) and 206(2) by failing to disclose its secret agreement to repurchase the Tenneco Core property.**

To find that Timbervest violated either Section 206(1) or 206(2), we must find that it was an investment adviser (which is undisputed), that it made a material misstatement or omission (or engaged in some other fraudulent activity), and that in so doing, it acted with the requisite level of culpability. To be found culpable under Section 206(1), Timbervest's officers or employees[11] must have acted with scienter, which is defined as a "mental state embracing intent to deceive, manipulate, or defraud."[12] To find a violation of Section 206(2), we need not find that a

---

[9]     On June 8, 2012, during the Commission's investigation, Timbervest reimbursed the $1,156,236 in commissions and approximately $96,315 in interest.

[10]    During the hearing before the administrative law judge, Respondents and the Division spent considerable time arguing whether, and to what extent, the Employee Retirement Security Act of 1974 (ERISA) applies here. Critically, neither party has claimed that ERISA somehow displaces the securities laws or conflicts with them in any respect relevant here. We find it unnecessary to address any of the ERISA-related issues in this decision.

[11]    *See Montford*, 2014 WL 1744130, at *14; *see also, e.g., Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001).

[12]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter can be established by recklessness, *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990), which is "highly unreasonable" conduct that represents "an extreme departure from the standards of ordinary care, which presents a danger of misleading [investors] that is either known to the defendant or is so obvious that the actor must have been aware of it." *Steadman*, 967 F.2d at 641-42 (quotation omitted).

respondent acted with scienter—a finding of negligence is sufficient.[13]  Circumstantial evidence is sufficient to prove a violation of the securities laws and to establish the requisite, culpable mental state in securities fraud cases.[14]  A misstatement or omission is material if a reasonable investor would have considered the information important in making an investment decision.[15]

As BellSouth's investment adviser, Timbervest owed fiduciary obligations to its client. These fiduciary responsibilities include an "affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts.'"[16]  These fiduciary responsibilities also include a "duty to disclose any potential conflicts of interest accurately and completely, and to recognize ... a potential conflict."[17]  As Jones (himself an attorney) conceded during his testimony, "[a] conflict of interest may exist whenever the private interests of an employee, officer, or manager conflict in any way or even appear to conflict with the interests of ... its client[.]"  The "standard of care to which an investment advisor must adhere" incorporates all of these fiduciary duties.[18]  For that reason, an investment adviser who fails to disclose a conflict of interest acts, at a minimum, with "a reckless disregard for the well-established fiduciary duty he owe[s] his clients," and thus scienter.[19]

---

[13]    *See Steadman*, 967 F.2d at 641 & n.3; *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963).

[14]    *See, e.g., Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983) (noting the sufficiency of circumstantial evidence, particularly in fraud cases); *Derek L. Dubois*, Securities Exchange Act Release No. 48322, 2003 WL 21946858, at *3 (August 13, 2003) (same); *see also Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) ("Proof of scienter under the securities laws need not be direct, but may be a matter of inference from circumstantial evidence." (quotation marks omitted)); *Donald M. Bickerstaff*, Exchange Act Rel. No. 35607, 52 SEC 232, 1995 WL 237230, at *5 (Apr. 17, 1995) (finding witness's testimony to be "persuasive evidence" even though it was "circumstantial").

[15]    *See SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 240 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[16]    *Capital Gains Research*, 375 U.S. at 194; *SEC v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1985).

[17]    *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003); *see also* 17 C.F.R. 275.206(3)-2(c) (investment advisers have a "duty with respect to the best price and execution for the particular transaction for the advisory client").

[18]    *Blavin*, 760 F.2d at 711; *see also Transamerica Mortg. Advisers, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).

[19]    *Montford & Co., Inc.*, Advisers Act Release No. 3829, 2014 WL 1744130, at *19 (May 2, 2014).

We find that Timbervest violated Sections 206(1) and 206(2) by engaging in an undisclosed sale-and-repurchase of the Tenneco Core property that benefitted TVP-1 at BellSouth's expense. Notwithstanding its duty to BellSouth of utmost good faith and fair dealing and its duty of full and fair disclosure of all material facts, Timbervest was actually on both sides of this transaction, but it did not disclose that fact to BellSouth. Instead, Timbervest disguised its intent to repurchase the property by selling it to a middleman—Wooddall—who, unbeknownst to BellSouth, had secretly agreed to sell it back to Timbervest shortly thereafter.

Wooddall testified that Timbervest made a deal with him in which it was understood that Timbervest intended to buy the property back within six months: The "deal, in a nutshell, was they were selling [me] the land, they wanted to buy it back, they had to raise this fund to buy it back, and I wasn't obligated to sell it to them, but the gist of it was they needed six months to raise this fund to buy it back." Although Wooddall wanted Timbervest to sign a written agreement to repurchase the property, Boden "said they could not commit in writing." Wooddall eventually agreed to a verbal arrangement. Timbervest thus agreed to sell the property to Wooddall, while promising him that it would buy the property back for approximately $1 million more than Wooddall would pay for it. Wooddall testified that the repurchase price was negotiated in advance of the sale so that Wooddall would know his potential "upside" on the deal.[20]

Contrary to Wooddall's testimony, Boden claims that Timbervest "didn't offer or guarantee or promise any type of buy-back on [the] property." We find for the following reasons that the weight of the evidence supports Wooddall's account of the deal.

*First*, we are not persuaded by the testimony of the Timbervest partners, each of whom testified at the administrative hearing. Although Boden purports to remember vividly that the buy-back agreement "just didn't happen," the partners purport to have no memory of what motivated their subsequent decision to repurchase the Tenneco Core property.[21] Not one partner,

---

[20]    Wooddall testified that he was technically "free to sell the property to anybody else" but did not do so because of the repurchase arrangement. That the arrangement was not legally binding does not change the fact that the arrangement constituted a material conflict of interest that should have been disclosed to BellSouth.

[21]    We do not credit Respondents' claim that too much time had passed for them to remember the motivation for the repurchase. During their testimony, Respondents had little difficulty recalling events that appear to be beneficial to the positions that they are advancing in this litigation. We are particularly struck by Boden's claimed inability to remember the details of the alleged decision to reacquire Tenneco Core because he demonstrated an ability to recall the intimate details of other business deals predating the Tenneco Core transaction. For example, in connection with a 2005 attempted sale of another BellSouth property (the Glawson tract), Boden testified:

> I picked up the paperwork, the option agreement from Mr. Harrison's office in Buckhead on the way to may meeting with Mr. Hailey [the potential purchaser]. I

for example, recalls why he decided to repurchase the Tenneco Core property. Boden conceded that the repurchase "was definitely an anomaly"—"it was the only time [Timbervest] bought a property back." Jones similarly admitted that the repurchase was "unusual" and that nothing else like it had occurred while he was at Timbervest. Yet, according to Boden, the repurchase was "just another deal in a long list of scores of deals, nothing jumped out at [him] and [he] do[es]n't recall anything special about it." The self-serving recollection that Timbervest did not promise a buy-back appears to be Boden's only significant memory of the deal. We do not find this credible.

*Second*, not only were the Timbervest partners unable to recall why they *actually* repurchased the property, but they could not even identify a persuasive reason why they innocently *might* have done so. Boden speculated that they might have repurchased the property because they saw that adjoining parcels of timberland (known collectively as the "Tenneco Non-Core property") were being sold at higher prices. But Timbervest was already aware of the higher value of those adjoining parcels before it agreed to sell BellSouth's property in October 2006.[22] Boden and Zell also speculated that the unusual repurchase may have been motivated by the fact that timber prices for pulpwood were "moving up." But, as Wooddall explained, "[i]t is better not to buy timberland during a spike in timber prices." Finally, Boden suggested that the fourth-quarter results for a general index of timberland prices may have motivated the repurchase. But those results would not have been available "in early November 2006" when Boden claims he first developed an interest in Timbervest repurchasing the property for the TVP-1 fund.[23]

---

didn't proof it, I didn't look at it until I got there. I dropped the [purchase-and-sale agreement] and the option down and said, 'Here's, here's a potential deal, what do you think?' And he studied it, thought about it for a few days, and called me back to decline."

As yet another example, Boden testified as follows about the 2004 departure of a Timbervest associate:

I know he was given a laptop computer, and I know he got a fee—or he paid us a fee—to take over contracts of some parcels of land I had negotiated for purchases earlier in the year with J.W. Irving Company out of Maine, it was about 130,000 acres in two tracts near the Allgash …. So he paid us, our company, an exit fee with us allowing him to take those over because they were a fit for him and what he was doing and were not really a fit for us.

[22]    An August 2006 "New Forestry Disposition Report" prepared by Timbervest for BellSouth estimated a $1,424 per acre sales price for the adjoining, Tenneco Non-Core parcels—only $37 per acre below the actual October-November sales prices of those properties.

[23]    It is possible that Boden may have observed in October and early November anecdotal evidence of the price movements that were subsequently reflected in the general index. But even supposing that, neither Boden nor the other Timbervest partners offered any explanation for why such anecdotal evidence of an overall increase in the value of timberland would lead them to

*Third*, the weight of the evidence persuades us that the reason Timbervest sold and repurchased the property was to benefit its new TVP-1 fund by acquiring the property at a discount to its fair market value. As explained above, Timbervest's reduced management fees from BellSouth and the opportunity to gain from the Timbervest partners' own investment in, and management of, the TVP-1 fund gave Timbervest a motive to benefit the new fund. The pricing of the sale-and-repurchase transaction suggests that this was the transaction's true purpose. The bank that loaned Chen Timber, Wooddall's company, the funds to acquire the property from Timbervest appraised it at $15.5 million in October 2006,[24] but Timbervest sold it that same month on behalf of BellSouth for just $13.45 million.[25] Once Timbervest repurchased the Tenneco Core property for TVP-1, it valued the property on TVP-1's books even higher than the appraisal value, at $15.7 million, and told TVP-1's own investors that the property was worth over $18.9 million. Notably, the price Timbervest paid to repurchase the property from Wooddall was just $14.5 million—well below the appraisal and Timbervest's own valuation.[26]

*Fourth*, Timbervest misled BellSouth about the true nature and value of the deal. Not only did Timbervest fail to disclose its intent to repurchase the Tenneco Core property from Wooddall, but it also made the property appear less valuable to BellSouth than it really was. In June 2005, an independent appraiser estimated the property's market value at $12.13 million. As Boden acknowledged, the market price for timberland began to "head-up" and "got hot in latter '05 and '6 and '7." Yet, despite the hot market, Timbervest *lowered* the valuation it provided BellSouth to just $12.04 million in September 2006—making it appear to BellSouth that the sale to Wooddall was a good deal. Before the sale, Timbervest (in an email sent by Jones to a BellSouth representative, ORG) also characterized Tenneco Core as having "challenging access issues."

---

make the unusual decision to attempt to reacquire a property that they had *just* sold weeks earlier.

[24]     Although it appears from the record that the bank did not provide this appraisal to any of the parties to the transaction, we nevertheless believe that it is relevant because it tends to indicate that the Respondents substantially undervalued Tenneco Core when they sold it to Chen Timber.

[25]     Wooddall testified that he believed that he paid a "fair purchase price" that was not "an undervaluation of the property," but we place little weight on this opinion. Given that Wooddall was not looking to hold the property and that his principal interest was the pre-arranged, $1 million profit margin that Chen Timber stood to make when Timbervest repurchased the property, we find it unlikely that he was focused on whether the $13.45 million was an accurate reflection of the property's market value, and, in any event, it is irrelevant given Respondents' knowledge of the property's value.

[26]     Jones testified that the $14.5 million repurchase price "was a discount of what [Timbervest's] due diligence valuation yielded by a fairly substantial amount."

After the repurchase, Timbervest's tune abruptly changed. Rather than describing the property's access as "challenging," Timbervest told TVP-1's investors that it had "excellent" access. Further, in a February 2007 document prepared for TVP-1's investors, Timbervest highlighted numerous other positive details about the property, such as the fact that it was "situated for optimal recreational opportunities within a short drive of several large cities"—details that were omitted from the information provided only six months earlier to BellSouth when Timbervest was in the process of selling the property.[27] Consistent with Timbervest's sudden change in valuation and characterization of the property after repurchasing it, Timbervest also changed Tenneco Core's name to Gilliam Forest, making it more difficult for outsiders such as BellSouth or its agents to discover the repurchase.[28]

*Fifth*, record evidence demonstrating that Timbervest had previously attempted a similar scheme lends further support to our conclusion that Timbervest orchestrated a secret sale-and-repurchase. A year before the Tenneco Core transaction, Boden sought to sell and repurchase a different Tenneco Core property, the Glawson tract.[29] Boden solicited Reid Hailey, who owned a real estate business and had known Boden for about twelve years, to serve as the middleman for the sale-and-repurchase arrangement. According to Hailey's testimony, Boden offered to sell the Glawson tract to Hailey with a written option agreement that gave a shell company the right to subsequently purchase the property back. The shell company was formed and controlled by Boden's "very good friend" of "[o]ver 30 years" and personal attorney, Ralph Harrison.[30] Hailey decided he was not interested. But he provided Boden's draft option agreement to a third party who in turn sent the Timbervest partners a letter threatening to expose them for attempting

---

[27]     Boden conceded during his testimony that "[t]here's definitely an issue" with the inconsistency.

[28]     Timbervest also misled BellSouth into believing that Timbervest did not initiate the original sale or the repurchase. In an April 7, 2006 email to ORG, Jones falsely represented that "the Tenneco property … [has] been designated for sale as a result of an *unsolicited* favorable offer received in July 2006." (Emphasis added). Timbervest continued to misrepresent its role in initiating the sale even after it occurred, falsely stating in a 2006 fourth quarter report to BellSouth that "in Q3 2006, an offer to purchase the unit [Tenneco Core] … was received from a private investment company[.]" Similarly, after the repurchase, an employee of an outside consulting firm that Timbervest utilized sent an email to Timbervest's director of land management, John Carter, expressing concern that , "literally, it's basically a fund swap transaction." In an attempt to avoid suspicion of wrongdoing, Carter wrote back falsely representing that "[t]he buyer [Chen Timber] was presented with a different opportunity elsewhere and approached us with the idea of buying the property back."

[29]     We discuss the Glawson tract in more detail below when determining the appropriate remedies and when rejecting Respondents' claims of prejudicial error. *See infra* Part IV(A).

[30]     Harrison testified that he and Boden had been "college roommates," that Harrison was "a groomsman at [Boden's] wedding," and that Harrison has "taken vacations together with [Boden] and his family."

to use the agreement to sell the property to "family and friends" "at less than fair market value, while creating the appearance of an arm's length transaction to a third party." This experience could potentially explain why Timbervest refused to provide Wooddall with a written agreement to repurchase the Tenneco Core property.[31]

In sum, we find that Timbervest, acting with scienter, made material omissions regarding the sale-and-repurchase arrangement in violation of its fiduciary obligations. Investment advisers have a "duty to disclose any potential conflicts of interest accurately and completely."[32] As Jones (an attorney) conceded during his testimony, an agreement for a direct sale of Tenneco Core to TVP-1 "would be a conflict of interest" that Timbervest would have been required to fully disclose. That conflict of interest and the resulting duty of full disclosure remain when a middleman is used as Timbervest did here. But Timbervest did not disclose to BellSouth the fact that Timbervest had already arranged to repurchase Tenneco Core from Wooddall at the time that BellSouth sold Wooddall the property. This secret arrangement—which Timbervest orchestrated—was highly material because it created a conflict of interest that effectively put Timbervest on both sides of the Tenneco Core transaction.[33] Moreover, Timbervest acted with scienter in failing to disclose the repurchase arrangement. Timbervest's intent to deceive is evident to us from Boden's negotiation of the secret agreement with Wooddall. Scienter is also evident from Timbervest's below-market valuation of the property before the sale, followed by the sudden, dramatic increase in Timbervest's valuation of the property after the repurchase.

---

[31]      Respondents claim that the proposed Glawson transaction was never intended to be a sale-and-repurchase arrangement, but their arguments in support of this claim are unpersuasive. *First*, although Boden admits that he provided the draft option agreement to Hailey, he claims that he did so merely to show Hailey an example of a potential arrangement that a third party might enter into with Hailey that would help him "reduce [his] risk" on the transaction. But an option would not mitigate Hailey's downside risk, only limit his potential upside gain in the event the purchaser of the option were to exercise it. *Second*, Boden's attorney testified that he included his shell company in the option agreement he drafted for Boden merely as a "placeholder in the draft." We do not credit this explanation in light of attorney Harrison's use of four other shell companies for Boden, discussed below. *Third*, Respondents argue that Hailey's testimony should be rejected because he remarked to Boden's attorney that his testimony would be more favorable if Boden paid Hailey certain money owed to him. But Hailey explained that this comment was mere sarcasm. Based on our independent review of the record, we find Hailey's testimony to be more credible and less evasive than the contrary testimony of Boden and Harrison. Hailey's testimony is also supported by documentary evidence, including the draft option agreement.

[32]      *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003); *see also Montford and Company, Inc.*, Advisers Act Release No. 3829, 2014 WL 1744130, at *19 (May 2, 2014) (explaining that failure to disclose a conflict of interest is "a reckless disregard for the well-established fiduciary duty [an investment adviser] owe[s] his clients").

[33]      *Cf. Vernazza*, 327 F.3d at 859 ("It is indisputable that potential conflicts of interest are 'material' facts with respect to clients and the Commission.").

And it is evident from Timbervest's decision to promptly change Tenneco Core's name and Timbervest's description of the property following the repurchase.

**B.    Timbervest violated Sections 206(1) and 206(2) by imposing the undisclosed brokerage commissions.**

In addition to the secret sale-and-repurchase agreement, we find that Timbervest secretly imposed approximately $1.156 million in brokerage commissions on the Tenneco Core transaction and a second transaction involving a BellSouth property in Kentucky. As discussed above, shell companies were used to funnel the commissions from BellSouth to the four Timbervest partners.

Boden and Harrison maintain that the shell companies were not established to hide the fact that the four partners were receiving real-estate commissions. They instead offer an elaborate alternative explanation: Shortly after Boden joined Timbervest in 2002, they claim, Timbervest (through Shapiro) entered into an oral agreement with Boden under which Boden would receive a real estate commission on the sale of any of the eight largest southeastern properties in New Forestry's account sold over the next five years. Respondents claim that they disclosed this agreement in 2006 to a third-party representative that BellSouth had retained to assist with the New Forestry account. They further claim that Boden, with the help of Harrison, established the shell companies merely out of "concern that unknown brokers or other third parties might try to assert a claim to the commissions that [he] expected to receive." Finally, despite the fact that they were supposedly Boden's commissions, the Timbervest partners claim that they each received a quarter of the commissions because Boden generously decided to share his commissions with them after he received the money. As discussed below, we do not find Respondents' version of these events to be credible.

**1.    Respondents used shell companies to hide the brokerage commissions from BellSouth.**

The weight of the evidence convinces us that the reason Boden and Harrison set up the shell companies was not to protect Boden's commissions from other brokers, but rather to hide the commissions from BellSouth.

As Harrison admitted during his testimony, the LLC "special entity" structure is "a common strategy to make [money] harder to follow" and to make it difficult for outsiders to determine "who owns or controls" the entity. The shell entities here appear to have been established with that common strategy in mind given that none of the entities' corporate documents reflect any ownership or control on the part of Boden or the other Timbervest partners. Harrison and Boden were careful to avoid any apparent link between the shell entities and Boden. Harrison testified, Boden "didn't have a documented legal right" to the money that went into the shell entities; according to Harrison, he and Boden just "had an understanding that it was [Boden's] money."

Boden's effort to hide the commissions from BellSouth is also apparent from the manner in which the shell entities were described in the contracts to sell the properties. The sales

contract with Wooddall falsely stated that "Fairfax Realty Advisers LLC has acted as a brokerage agent on behalf of the *purchaser*" (*i.e.*, Chen Timber)—when Fairfax Realty in fact did nothing for the purchaser.[34]  The sales contract for the Kentucky property also vaguely described the commission to Westfield Realty as a fee for "services rendered."  Although the commissions were supposedly for services Boden provided exclusively to the *seller* in the transaction, the agreements obscured that fact—a fact that could have aroused suspicion and prompted BellSouth to investigate why it was being charged commissions.

Although Boden purports to have been concerned about other brokers claiming his commissions, we do not find this credible.  Boden admitted that he was not aware of a single instance in which a real estate broker had filed a lawsuit against another broker for fees or commissions that the first broker had been promised by the seller or buyer of the property.  Boden also admitted that he was unaware of "any specific claims by brokers to commissions from the sale" of the New Forestry properties for which he purportedly had a right to a commission.  Neither Boden nor Harrison identifies any plausible theory upon which such a lawsuit could have been maintained against Boden.[35]  We also believe that Boden likely would have reduced the terms of his oral agreement to writing if he were actually concerned about another broker's claim to his commissions in order to demonstrate his own purported right to those commissions.

Furthermore, the shell entity structure would not actually have accomplished the purpose Boden claimed for it.  The entities likely would not have prevented a lawsuit from a broker seeking to obtain the commissions, nor would they have precluded a recovery if a lawsuit succeeded.  Indeed, Harrison conceded that, in any lawsuit, he would likely have been required to disclose where the money ultimately went.

Finally, the manner in which the shell entities were established makes it difficult for us to believe Boden's explanation.  Harrison testified that his friend Boden approached him "after a baseball game" to obtain his legal advice, and "based on [that] five-minute conversation," Harrison was "able to determine all the relevant facts [that he] needed to know in order to help Mr. Boden protect himself from liability."  Harrison suggested to Boden that they "set up [the] LLC's as a special purpose entity," and Boden's response at the end of this five-minute

---

[34]    Boden admitted that the statement was incorrect, but attributed this to a mistake by Wooddall.  Boden acknowledges that he personally reviewed the draft sales contract, including the incorrect language.  We find it improbable that Boden overlooked the inaccuracy, given that he suggested a change to the very same portion of the contract.

[35]    Although Boden also claims to have been concerned that Timbervest's former CEO might have entered into unknown arrangements with unspecified third-party brokers for commissions, we do not believe that any such concern motivated him here.  Any such individuals could claim some share of the commissions only if they stepped forward to provide some service in connection with the sales transaction.  Perhaps then Boden might have had some cause for concern, but in the absence of this occurring, we find it implausible that Boden's true motivation for approving the shell companies was to avoid losing his brokerage commissions to an unknown third-party broker.

conversation was, "'Fine, just handle it, I'll pay you 10 percent of whatever I get.'" Harrison testified that he and Boden had no further conversations "of substance" about the "arrangement or engagement." Although Harrison spent less than 20 hours setting up the shell entities for Boden, his 10 percent share of the eventual commissions amounted to $110,000—an inexplicably large contingency fee for minimal work, and for a type of legal work that Harrison acknowledged is not typically performed on a contingency basis.

### 2.    Timbervest made a series of material omissions and misstatements relating to the brokerage commissions.

Respondents maintain that the commissions were disclosed to BellSouth during one phone call that took place in 2005. We find that the commissions were not in fact adequately disclosed on that phone call.

At the time of the call, BellSouth had recently hired ORG Portfolio Management, a registered investment adviser, to oversee Timbervest's management of the properties in BellSouth's New Forestry account. According to Shapiro, he called ORG's Edward Schwartz and told him that Timbervest had previously made an oral agreement with Boden in 2002 to pay Boden the real estate commissions. There is no dispute that Shapiro placed this phone call on behalf of Timbervest in his official capacity as the company's CEO. Shapiro does not recall the details of the conversation, but says that he "just remembers telling [Schwartz] the basic deal" and "mak[ing] him aware that Mr. Boden would be receiving a fee at some point if he sold some of these properties." Shapiro claims that, after the conversation, he "walked away thinking [the arrangement] was fine." Schwartz remembers the conversation differently. He recalls a "hypothetical" discussion that merely gauged his reaction to Timbervest "bringing someone in" and paying them "a brokerage commission for work they did prior to" joining Timbervest. He claims there was no mention of a fee or commission being paid to Boden. Rather than telling Shapiro that the arrangement was "fine," Schwartz recalls telling him that he had "concerns" and that he "would have to run it by legal counsel."

Although the recollections of Shapiro and Schwartz differ, we need not decide whose account of the phone call is correct because, even under Shapiro's account, the commissions were not adequately disclosed. We reach this conclusion for three independent reasons.

During the phone call, Shapiro omitted several material facts about the purported oral arrangement with Boden. He did not disclose the amount of the commissions, the properties covered, the time period of the arrangement, or the fact that the other Timbervest partners would be sharing the commissions. The last of these facts was particularly significant because it affected the incentives all of the partners had to approve the sale of BellSouth's property.[36]

---

[36]    We do not find credible Boden's claim that, despite his supposed longstanding agreement with Timbervest entitling him to the commissions, he just decided to share the commissions equally with his partners after the two BellSouth properties were sold. The facts and circumstances surrounding the payments, including the size of the payments, make Boden's claims unbelievable in our view.

Neither Shapiro nor any of the other Respondents ever informed anyone at BellSouth that a Timbervest principal would be receiving brokerage commissions.[37]  When BellSouth hired ORG, it sent a letter to Zell's attention instructing Timbervest that "ORG should be copied on all reporting and correspondence . . . *in addition to the existing reporting to BellSouth*," and Zell shared this letter with each of the other Timbervest partners.  But Shapiro's only purported disclosure of the fees was a single phone call to Schwartz at ORG, and Schwartz was not even the lead ORG account representative overseeing BellSouth's New Forestry properties.[38]  This one oral disclosure solely to a secondary account agent at ORG—along with the use of shell companies, the misrepresentation of the commissions in the sale agreements, and the failure to put any disclosure of the commissions in writing—convince us that Timbervest did not seek to fully disclose the commissions to BellSouth or obtain its consent.[39]

In any event, even giving Shapiro the benefit of the doubt that he made a full disclosure during his conversation with Schwartz about all of the material terms of Boden's alleged commission arrangement, we would still find that Shapiro made material omissions and misstatements.  Specifically, the weight of the evidence convinces us that, contrary to Respondents' assertions, no five-year oral agreement to pay Boden real estate commissions was entered into when Boden joined Timbervest in 2002.  We find that Timbervest violated its fiduciary obligations of good faith and full and fair disclosure of material facts by concocting the claims about the oral agreement at some point after BellSouth reduced Timbervest's management fees in 2005.  Timbervest did so to defraud BellSouth into paying the commissions.

The following considerations lead us to conclude both that there was no oral agreement entered into in 2002 to pay Boden real estate commissions and that the claims about the agreement were intended to defraud BellSouth.

---

[37]     Zell testified that "regardless of what anyone at Timbervest may have disclosed to Ed Schwartz at ORG, Timbervest never sought consent from BellSouth for the payment of fees to a Timbervest principal."

[38]     There was some testimony during the hearing that Shapiro eventually developed a bad relationship with the lead ORG account representative.  In our view, this would not explain why Shapiro spoke with Schwartz, a secondary account representative, since at the time of the phone call ORG had been retained only weeks earlier by BellSouth.

[39]     Zell also claims that Shapiro advised him about Timbervest's commission agreement with Boden in late 2002, when Zell was still employed at BellSouth and just months before Zell left to go work at Timbervest.  But we do not find this self-serving testimony persuasive in light of the overwhelming evidence demonstrating that no such agreement in fact existed, which we discuss below.  And in any event, in 2002 Boden was not a principal at Timbervest so any disclosure at that time (had it actually occurred) would not have addressed the manifest conflict that arose once Boden became a partner and received the brokerage commissions.

- Despite supposedly entitling Boden to commissions for five years, the purported agreement was never put in writing. This is particularly surprising because of the amount of the potential commissions involved, the multi-year duration of the arrangement, and the fact that the arrangement involved a number of specific features that one would normally want to reduce to writing (*e.g.*, eight specific properties, a sliding-scale compensation scheme).

- This substantial commitment was supposedly made "within a couple of weeks of [Boden] showing up" at Timbervest, and it was supposedly offered by Shapiro, at a time when he was himself on a 90-day trial period at Timbervest, was not drawing a salary, and was "basically a consultant" tasked with "figur[ing] out if [Timbervest] was a profitable business."

- Further, while Shapiro claims to have promised Boden commissions to sell New Forestry's eight largest southeastern properties worth $144 million (including Tenneco Core and the property in Kentucky), BellSouth at that time in 2002 had asked Timbervest to sell only $30 to $60 million worth of property;[40] it is therefore doubtful that Shapiro would have entered into a commission arrangement for $144 million worth of New Property sales.[41]

- Notwithstanding the large number of real estate transactions that Boden claims that he participated in each year at Timbervest, Boden made no sales whatsoever under the oral agreement for the first four years that it supposedly existed. It was only in the last year of the oral arrangement—at a time when Boden and the other Timbervest partners had "extended" themselves in buying the company *and* BellSouth had dramatically reduced Timbervest's management fees—that Boden made his first sale under the purported agreement.[42]

---

[40]     The requested $30 to $60 million reduction in 2002 was a separate request from the subsequent reduction that BellSouth ordered in April 2005 that would have brought the assets under management down to $250 million. Moreover, testimony during the hearing indicated that Shapiro's strategy for dealing with BellSouth's 2002 directive to sell $30 to $60 million worth of property was to delay acting on it to avoid losing the management fees, which we believe further calls into doubt any claim that Shapiro entered into a commissions arrangement with Boden in connection with the sale of BellSouth's properties.

[41]     Doing so also would have made little business sense to Timbervest at the time because its revenues came overwhelmingly from management fees calculated based on the total assets in BellSouth's New Forestry portfolio, and would have worsened Timbervest's financial position had the sales occurred by reducing the net assets under management upon which Timbervest's management fees were calculated.

[42]     We do not credit Respondents' claim that the purported brokerage commission arrangement was intended to serve as Boden's compensation for the work that he did after joining Timbervest. Boden testified that "I worked for 20 months under the advisory fee arrangement from like September 2002 to April 2004, without getting any money at all." Boden

- Additionally, Jerry Barag, Timbervest's former chief investment officer, testified that, during his time at Timbervest (from March 2003 through December 2004), he never heard anything about any such arrangement. We believe that, had such an agreement existed, Barag would have known about it because of his role as chief investment officer, and because Timbervest was a small operation with only a few employees working in close proximity where "everybody was involved in everything that was going on."

- Finally, Boden's testimony about the commission structure established by the oral arrangement inexplicably conflicted with how he implemented it in a contract for the sale of another property in BellSouth's New Forestry account, the Rocky Fork property (an agreement that was signed but that fell through before the sale closed).[43]

In sum, we find that Timbervest made a material omission when it failed to disclose to BellSouth that the four Timbervest partners would receive over $1 million in commissions. Even assuming some disclosure of the "basic deal" was made on the phone call to Schwartz, several material terms were omitted, as described above. Further, Timbervest made material misstatements when Shapiro (on behalf of Timbervest) told Schwartz about an agreement with Boden that did not exist, when Respondents used shell companies in the sales agreement to hide the identity of the true recipients of the commissions, and when Timbervest executed a sales agreement that falsely described one of the shell companies in the sale agreement as providing services to the buyer rather than the seller. These facts also convince us that Timbervest's misstatements and omissions were made with scienter.

## C.     The individual Respondents aided, abetted, and caused Timbervest's violations.

Our *de novo* review of the record leads us to conclude that Boden, Shapiro, Jones, and Zell—through their collective control of Timbervest—caused the fraud on BellSouth. We also find that the four Timbervest partners aided and abetted Timbervest's violations because they

---

further testified that "my interest vested in that agreement, I earned those fees during that period of time[.]" But during his investigative testimony, Boden stated that "I think July of 2003 was when I first officially got an actual paycheck from [Timbervest]," and "[m]ost of what I did before that I didn't actually get paid for. It was [to] tell them how [Timbervest] could do things better[.]" We believe that Boden's investigative testimony is the more accurate reflection of his early compensation arrangement with Timbervest. In reaching that conclusion, we note that when his investigative testimony was given, the investigation "had a different focus" than the commission payments and thus we believe that Boden had no reason to misrepresent the facts about his compensation at that point. For the same reason, we do not credit Shapiro's hearing testimony that Boden had earned the commissions by "work[ing] for two years for free."

[43]     The 2 percent commission that Boden had written into the Rocky Fork sales contract was outside the range of the commission payments that Boden testified were provided for by the alleged 2002 agreement (4 percent to 2.5 percent).

had knowledge of the violations and their role in those violations, and they provided substantial assistance.[44]

As to the sale-and-repurchase agreement, we find that Boden plainly had knowledge of the misconduct and substantially assisted it because, among other considerations, he personally negotiated the agreement with Wooddall. We find that Shapiro, Jones, and Zell also had knowledge of the arrangement and substantially assisted it. Boden testified that he would "generally always discuss [any offer he was going to make] with one or more" of the Timbervest partners. Zell testified that he and Boden spoke internally about the repurchase, and Boden was "pretty confident" that he and Shapiro spoke about it as well. Further, as members of Timbervest's investment committee, each of the four Timbervest partners had to vote to approve both the sale and the repurchase.[45] At a minimum, we believe that the partners must have known about the arrangement when they voted to repurchase the property from Wooddall after having sold it to him only a short time before.[46] It is implausible that they would have voted to repurchase the property for $1 million more than the price at which they had just sold it weeks earlier without being fully aware that the repurchase was pre-arranged.[47] The partners' knowledge is further confirmed by the fact that not one of them could recall why they repurchased the property only weeks later, or even offer a plausible reason why they might have done so.

---

[44]     A person is liable for aiding and abetting a violation of Section 206 if there is "(a) wrongdoing by [the investment adviser]; (b) a general awareness or reckless disregard by [the person] of the wrongdoing and of his role in furthering it; and (c) [the person] substantially assisted the wrongdoing." *Abraham & Sons Capital, Inc.*, Exchange Act Release No. 44624, 2001 WL 865448, *7 (July 31, 2001). A person who aids and abets violations is also "necessarily a cause of those violations." *Id.* For both Section 206(1) and 206(2), it is sufficient to establish knowledge by showing recklessness when the alleged aider and abettor is a fiduciary or active participant. *See, e.g., German v. SEC*, 334 F.3d 1183, 1195-96 (10th Cir. 2003); *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990).

[45]     As Shapiro admitted during his testimony, "each of [the Timbervest] partners approved the sale by New Forestry of the property for 13.45 million dollars and the repurchase of the same property for 14-and-a-half million by [the TVP-1 fund]." Indeed, Shapiro admitted that "all purchase and sale decisions need to be unanimously agreed to by the investment committee to go forward."

[46]     Zell testified that the "normal practice" would be for the investment committee to review a proposed sale or purchase arrangement "two or three times" "over a number of days or weeks." Boden testified that he "couldn't bind the company to any deal without everyone's involvement."

[47]     Jones conceded during his testimony that the four Timbervest partners would have been aware of the "abbreviated timeline" and the $1 million price differential between the sale and repurchase of Tenneco Core.

As to the real estate commissions, Boden's knowledge and substantial assistance are apparent from the efforts he made to hide the commissions, including establishing shell companies, directing the payments through multiple accounts, and using cashier's checks to distribute the proceeds.[48] Shapiro's knowledge and substantial assistance are likewise apparent from his material misstatements and omissions on the phone call with Schwartz.

We also find that Jones and Zell had knowledge of Timbervest's violations in connection with the commissions, and substantially assisted the violations. Both Zell and Jones knew that the brokerage commission would be paid prior to giving their approval for the Tenneco Core sale. Zell testified that he knew "[a]t least a month, but I'm assuming it's at least two plus months" before the Tenneco Core transaction closed that the brokerage commission would be paid.[49] Jones similarly testified that he "was aware that a fee *was going to be paid* to Mr. Boden." (Emphasis added). Based on their testimony, we find that they were both aware of the commissions when, as members of Timbervest's investment committee, they gave their approval to the sale contract being executed. This constituted knowledge of the violations and substantial assistance.[50]

Additional considerations support our finding that Jones and Zell knowingly participated in planning and executing the scheme to secretly obtain and share the real estate commissions.

_____

[48]     *See generally Robert D. Tucker*, Exchange Act Rel. No. 68210, 2012 WL 5462896, at *11 n.56 (Nov. 9, 2012) (stating that "efforts to conceal violative conduct demonstrate scienter"); *Phillip J. Milligan*, Exchange Act Release No. 61790 (March 26, 2010) (attempts to conceal misconduct support a finding of scienter); *see also In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp.2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter"); *In re Connetics Corp. Sec. Litig.*, No. 07 Civ. 2940, 2008 WL 3842938, at *15 (N.D. Cal. Aug. 14, 2008) (strong inference of scienter based on efforts to conceal stock sales).

[49]     Zell also testified that he knew a month or two before the closing on the Kentucky property that the brokerage commissions would be paid.

[50]     Jones's opening brief appears to assert that Jones's involvement as a member of the investment committee would have ended months before the September 2006 sale. Jones's Opening Br. at 2 ("The Investment Committee would have most likely evaluated the sale by New Forestry in May or June 2006."). Notably, no record citation is provided for this assertion. Moreover, this assertion conflicts with Jones's own testimony in which he said "[t]he investment committee would approve a sale *prior to* the sale contract being executed." (Emphasis added). Further, Shapiro testified that "each of [his] partners approved the sale by New Forestry of the property for 13.45 million dollars[.]" Earlier versions of the sales agreement had provided for a lower sales price, so the partners could not have agreed to the sale much earlier than September 15, 2006, when the agreement was executed. In any event, Jones testified that he learned the actual amount of the brokerage commissions that were to be paid to Boden before the sales contract was signed, which supports the conclusion that his involvement with the sale had not ceased months earlier.

21

We find it implausible that Boden, after receiving the commissions (money that he had supposedly earned for work done years earlier), simply decided to give three-quarters of it—approximately $780,000—to the other partners.[51]  In our view, the actual explanation for why Boden gave $260,000 each to Jones and Zell is that this money was their share of the ill-gotten gains from their participation in the fraud, including their approval of the Tenneco Core and Kentucky property transactions on which the brokerage commissions were paid.[52]  We also find it relevant that Jones and Zell actively sought to cover up the fraud by, among other things, providing testimony—which we do not find credible—to support the claim that Shapiro and Boden entered into an oral arrangement for the commissions in 2002.[53]  Their participation in the cover up of the fraud supports the inference that they actively and knowingly participated in the underlying misconduct.[54]  We further find that, contrary to Zell's testimony, he knew that that Boden had used the Fairfax Realty shell entity to receive the commission payments.[55]  We

---

[51]     The quarter share that each of the Timbervest partners received was not an insubstantial sum of money to them given that it exceeded their $250,000 per-partner annual salary in 2006.

[52]     *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) (stating that "personal financial gain may weigh heavily in favor of a scienter inference"); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir. 1986) ("If the plaintiff does not have direct evidence of scienter, the court should ask whether the fraud (or cover-up) was in the interest of the defendants."). *See generally United States v. Floyd*, 740 F.3d 22, 29 (1st Cir 2014), *cert denied sub nom, Dion v. United States*, 135 S. Ct. 124 (2014) ("Receipt of a share of a conspiracy's proceeds may be probative of the recipient's participation in the conspiracy.").

[53]     Specifically, Jones testified that he first learned of the arrangement in 2004 when he joined Timbervest and Zell testified that he first learned of the arrangement in 2002 while he was still working at BellSouth.

[54]     *See generally United States v. Fusaro*, 708 F.2d 17, 21 (1st Cir.1983) (explaining that "attempts to cover up the scheme as it unraveled" can "provide[] the basis for the inference that [the defendant] acted with the requisite intent and knowledge").

[55]     After the Tenneco Core closing, Zell authorized a $300 payment to Fairfax Realty, the shell company that received the Tenneco Core commissions.  The check, which stated "commission" in the memo line, was the balance of the brokerage commission payments supposedly owed on the Tenneco Core transaction.  Although Zell claims that he was simply given the check to sign by Timbervest's accounting personnel and that at the time did not realize what the check was for, we believe that Boden would have addressed the shortfall with Zell given Timbervest's small size (it was a 15-person operation at this time), Zell's central role in managing the BellSouth account, and the close, collaborative relationship among the Timbervest partners.  At a minimum, upon seeing the check for a "commission" payment, we believe that Zell would have asked questions about the check before signing it and in so doing would have learned both that Boden had requested it and that Boden was using Fairfax Realty to receive the commission payments.  For these reasons, we do not credit Zell's testimony that he only learned much later that Boden had used Fairfax Realty to receive the brokerage commission or his testimony that he did not know anything about the $300 check.

similarly find that Jones, as the General Counsel of Timbervest, must have been aware that the Tenneco Core and Kentucky property contracts misrepresented that the brokerage commissions would be paid to the shell entities.[56] The failure of Zell, a long-time manager of pension plan assets, and Jones, an experienced lawyer and Timbervest's compliance officer, to document either Boden's purported commission arrangement, the commission payments, or BellSouth's consent further supports the inference that they knew that the brokerage commissions had not in fact been approved by BellSouth.[57] At a minimum, we find that Zell and Jones recklessly disregarded the risk that BellSouth would be deceived.[58]

---

[56]    Jones testified that his direct report, Carolyn Seabolt, had responsibility for reviewing all sales and purchase agreements. Given the fact that Seabolt reported directly to Jones, as well as Timbervest's small size at the time (no more than 15 people worked there) and Jones's role in approving sales agreements as a member of Timbervest's investment committee, we believe that he must have known that the agreements provided for the brokerage commissions to be paid to the shell entities, not Boden.

[57]    Jones conceded that the brokerage commissions created a "conflict of interest" and that he could "understand how it would be important to put something in writing" given the potential "expenditure of many millions of dollars by Timbervest" of BellSouth's money. Yet he testified that he never suggested that the purported oral agreement for the commissions be reduced to writing.

[58]    In the initial decision, the ALJ found that Zell and Jones "subjectively" believed that Shapiro's conversation with Schwartz in 2005 constituted sufficient disclosure about the brokerage commission payments and thus concluded that they lacked scienter in connection with those payments. As an initial matter, we note that it is not apparent to us from reading the Initial Decision that this finding was based on the ALJ's assessment of Zell's and Jones's demeanor rather than his evaluation of the evidence. In any event, our *de novo* review of the record leads us to conclude that the weight of the evidence demonstrates that Zell and Jones could not have subjectively believed Shapiro's disclosure was sufficient. As we discuss above, we find that at the time they approved the Tenneco Core and Kentucky property transactions as members of Timbervest's investment committee, Zell and Jones knew that they were going to receive an equal share of the brokerage commissions. In our view, this fatally undermines their contention that they believed Shapiro's 2005 disclosure to Schwartz had been sufficient because, at a minimum, they must have known that Shapiro had not disclosed the material fact that they (or Shapiro) would be receiving a share of the brokerage commissions. Further, Zell and Jones could not have subjectively believed the disclosure to Schwartz was sufficient because BellSouth, when it retained ORG, advised Zell in writing that any disclosures or reports to ORG were not to replace the disclosures to BellSouth. As Zell conceded during his testimony, "Timbervest was still to report to BellSouth as it always had[.]" Zell shared BellSouth's written directions with Jones, so Jones too could not have subjectively believed that any disclosure to Schwartz was sufficient.

**D.      Respondents' misconduct is covered by the Advisers Act.**

Respondents argue that they cannot be held liable under the Advisers Act because their misconduct "involved real estate, not securities." The Advisers Act is not limited to misconduct that occurs in the course of securities transactions. Although the Act defines an "investment adviser" as someone who engages in the business of advising others about securities,[59] that advisory relationship gives rise to a broader fiduciary duty.[60] Where an investment adviser has an advisory relationship with a client, the Act provides (among other things) that "[i]t shall be unlawful for any investment adviser . . . to employ *any* device, scheme, or artifice to defraud *any* client."[61] This language is not limited to fraud in connection with a securities transaction. Had Congress intended such a limitation, it would have said so.[62] Thus, once an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship.[63] We believe that our long-standing interpretation of the scope of the Advisers' Act is appropriate because a contrary reading, which would allow investment advisers to exploit the advisory relationship by engaging in misconduct such as that at issue in this matter, would undermine the "climate of fair dealing which is so essential to maintain public confidence in the securities industry."[64]

---

[59]      15 U.S.C. 80b-2(a)(11).

[60]      *Capital Gains*, 375 U.S. at 194; *Transamerica Mort. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).

[61]      15 U.S.C. § 80b-6(1) (emphasis added).

[62]      *Compare* Securities Act Section 17(a), 15 U.S.C. § 77q(a) (prohibiting fraud "in the offer or sale of any securities"); Exchange Act Section 10(b), 15 U.S.C. § 78j (prohibiting fraud "in connection with the purchase or sale of any security").

[63]      We have previously recognized the broad scope of Section 206 of the Advisers Act in a variety of contexts. *See, e.g.*, *Proxy Voting by Investment Advisers*, Investment Advisers Rel. No. 2106, 2003 WL 215467, at *2 (Jan. 31, 2003) ("Under the Advisers Act ... an adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf. . . ."); *In the Matter of Bill C. (Billy) Crafton, Jr.*, Investment Advisers Rel. No. 3998 (Jan. 15, 2015) (investment adviser liable for collecting undisclosed fees regarding life insurance); *see also Applicability of the Investment Advisers Act*, Advisers Act Release No. 1092, 1987 WL 112702, at *9 (Oct. 8, 1987) (staff interpretive release stating that Sections 206(1) and 206(2) "do not refer to dealings in securities but are stated in terms of the effect or potential effect of prohibited conduct on the client"); *SEC v. Lauer*, 2008 WL 4372896, at *24 (S.D. Fla. Sept. 24, 2008); THOMAS P. LEMKE & GERALD T. LINS, REGULATION OF INVESTMENT ADVISERS (2013 ed.), at § 2:30 ("[T]he SEC has applied [206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.").

[64]      *Capital Gains*, 375 U.S. at 201.

24

Respondents do not dispute that Timbervest was a registered investment adviser. It is also apparent that Timbervest entered into an advisory relationship with the three BellSouth pension trusts that wholly owned New Forestry and with New Forestry, LLC, signing investment management agreements with each of these entities. These agreements empowered Timbervest to render advice regarding securities, such as investments in money market funds and equity investments in timber companies. And Timbervest did in fact provide advice about securities.[65] Timbervest's fraud in connection with the real estate transactions, and the individual Respondents' aiding, abetting, and causing of that fraud, are therefore prohibited by the Advisers Act.[66]

## IV.    Remedial Sanctions

As a preliminary matter, we note that Respondents argue that no sanctions should be imposed here due to 28 U.S.C. § 2462. That provision provides in pertinent part that:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . .

28 U.S.C. § 2462. It is undisputed that this proceeding was not brought within five years of the violations. Nonetheless, Section 2462 does not prevent us from imposing equitable remedial sanctions in this matter.[67]

---

[65]    For example, Timbervest in April 2006 advised BellSouth to acquire a $50 million equity interest in the Timbervest Crossover Fund.

[66]    Timbervest did not dispute in its briefs on appeal that it was an investment adviser with respect to New Forestry and the BellSouth pension funds. Indeed, when the Division's response brief expressly argued that the Advisers Act applies here because Timbervest had these advisory relationships, Respondents did not dispute that Timbervest was an investment advisor with respect to these entities. Because this is not a question of subject-matter jurisdiction, *Arbaugh v. Y & H Corp.*, 546 U. S. 500, 514 (2006), we find that Respondents have waived any claim that they lacked an investment advisory relationship with New Forestry and the BellSouth entities.

[67]    That said, we have considered the passage of time since Respondents' misconduct in considering whether and how to fashion the relief at issue to ensure that the remedies are equitable. *See SEC v. Rind*, 991 F.2d 1486, 1492-93 (9th Cir. 1993); *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 162 (5th Cir. 1972). In considering the passage of time, it is also pertinent that Respondents: (1) executed a complex fraud involving both misrepresentations and omissions; (2) employed secret agreements, middlemen, and shell companies to execute their fraud; and (3) offered testimony during the Commission's investigation that has turned out to lacked credibility.

The terms "civil fine, penalty, or forfeiture" in Section 2462 refer to relief "imposed in a punitive way,"[68] *i.e.*, relief that is "intended to punish" wrongdoers.[69] But the remedies at issue here—barring the Timbervest partners from associating with an investment adviser, and requiring Respondents to cease and desist their securities law violations and to disgorge their ill-gotten gains—are equitable, not punitive.[70] Barring the Timbervest partners from associating with an investment adviser is not "punishment" nor is it "punitive" because such bars protect investors in the future from unfit professionals.[71] Similarly, relief that requires Respondents to

---

[68]    *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915).

[69]    *Gabelli v. SEC*, 133 S.Ct. 1216, 1223 (2013).

[70]    *See also United States v. Banks*, 115 F.3d 916, 918-19 (11th Cir. 1997) (Section 2462 "does not apply to equitable remedies"); *United States v. Telluride Co.*, 146 F.3d 1241, 1245-46 (10th Cir. 1998) (same).

[71]    *Hudson v. United States*, 522 U.S. 93, 103-105 (1997) (holding that disbarment is not a penalty and affirming order of permanent debarment from the banking industry and a prohibition on banking activities), *aff'g*, 92 F.3d 1026 (10th Cir. 1996). *See also Coghlan v. NTSB*, 470 F.3d 1300, 1305-1306 (11th Cir. 2006) (holding that Section 2462 does not apply to the license revocation because it was remedial and designed to prevent future harm); *SEC v. Kelly*, 663 F. Supp. 2d 276, 286-87 (S.D.N.Y. 2009) (holding that Section 2462 does not apply to officer and director bars) (collecting cases); *Wright v. SEC*, 112 F.2d 89, 94 (2d Cir. 1940) (expulsion from securities exchanges "is remedial, not penal"); *SEC v. Culpepper*, 270 F.2d 241, 248-50 (2d Cir. 1959) (revocation of broker-dealer registration is not "punishment"); *accord United States v. Naftalin*, 606 F.2d 809, 812 (8th Cir. 1979).

We take this opportunity to clarify two matters in connection with prior Commission opinions. *First*, in our prior decisions we have at times *not* expressed the view that Section 2462 is categorically inapplicable to bars. This is explained by the fact that our administrative orders may under Exchange Act Section 25(a)(1) always be appealed to the D.C. Circuit, in which *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996), states the controlling rule—*i.e.*, that a bar based "solely in view of … past misconduct" could constitute a penalty for purposes of Section 2462. *Id.* at 490 n.20. But in district court actions, we have generally taken the position that Section 2462 does not apply to equitable remedies, *SEC. v. Quinlan*, 373 F. App'x 581 (6th Cir. 2010); *SEC v. Kelly*, 663 F. Supp. 2d 276 (S.D.N.Y. 2009), and outside of the D.C. Circuit, the Commission maintains that *Johnson* was incorrectly decided, *Koch v. SEC*, 177 F.3d 784 (9th Cir. 1999) (decided on other grounds). Therefore, to the extent that we have acknowledged the applicability of *Johnson* in certain, previous adjudicatory decisions, those decisions should not be understood as a change from our position expressed above that Section 2462 does not apply to bars. *See, e.g.*, *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996) (recognizing that "agencies have the power of nonacquiescence in decisions of a single circuit"); *Johnson v. Railroad Retirement Bd.*, 969 F.2d 1082, 1092 (D.C. Cir. 1992). *Second*, we recognize that there are statements in prior Commission adjudicatory decisions that referred to Section 2462 as prohibiting the Commission from considering conduct that occurred outside the five-year statute of limitations in deciding whether to impose a bar. *See, e.g.*, *Warwick Capital*

cease their violations and comply with the law is not a "penalty" nor is it inequitable; its purpose is not to punish for past violations but to protect the public by preventing future violations.[72] And disgorgement, which simply "restores the *status quo ante*," is inherently equitable (not punitive) and thus is not within Section 2462's ambit.[73]

Furthermore, we do not justify the relief "solely in view of . . . past misconduct."[74] Rather, we focus on "the degree of risk [Respondents] pose[] to the public," including "findings demonstrating [Respondents'] unfitness to serve the investing public."[75]

A.     **Associational bars are warranted.**

In assessing the Timbervest partners' current competence and degree of future risk, we are guided in part by our traditional sanctions framework, which looks to:

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will

---

*Management, Inc.*, 2008 WL 149127, at *10 ("Section 2462 precludes consideration of Respondents' conduct occurring before July 6, 2001, in determining whether to impose an investment advisory bar or civil penalties."). We do not believe that this is a correct understanding of Section 2462 even under the view that the D.C. Circuit has adopted in *Johnson*—because conduct taking place before the five-year limitations period may shed light on the respondent's current competence or future risk to the public, *cf.* 87 F.3d at 489. *See generally Birkelbach v. SEC*, 751 F.3d 472, 481-82 (7th Cir. 2014) (recognizing that the Commission may consider "conduct outside the five-year time frame" in crafting a sanction because it may be pertinent to, among other things, the "possibility of future violations").

[72]     *See Meadows v. SEC*, 119 F.3d 1219, 1228 & n.20 (5th Cir. 1997).

[73]     *Johnson*, 87 F.3d at 491 (holding that Section 2462 does not apply to "disgorgement of ill-gotten profits"). *Accord Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009); *SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004). We note that Respondents do not argue that disgorgement is a punitive "forfeiture" under Section 2462 and, thus, we consider any such argument waived. And in any event, there would be no merit to such a contention. *See Riordan v. SEC*, 627 F.3d 1230, 1234 & n.1 (D.C. Cir. 2010) (concluding that disgorgement is not a forfeiture covered by Section 2462); *SEC v. Contorinis*, 743 F.3d 296, 306-07 (2d Cir. 2014) (highlighting the "substantive distinctions" between disgorgement and forfeiture).

[74]     *Johnson*, 87 F.3d at 490 n.20.

[75]     *Meadows*, 119 F.3d at 1228 n.20; *accord Johnson*, 87 F.3d at 489 (recommending that "the SEC [ ] focus[ ] on Johnson's current competence or the degree of risk she posed.").

27

present opportunities for future violations.[76]

Applying that framework, we believe that associational bars are warranted. [77]

The Timbervest partners' conduct was egregiously self-interested and undertaken with scienter.[78] As described above, they arranged together to cause Timbervest to commit the Section 206 violations. They used shell companies and cashier's checks to hide the commission payments. Through their role on the Timbervest investment committee, they falsely lowered Tenneco Core's valuation before the sale to Chen Timber and changed the property's name after the repurchase in an effort to cover up the fraudulent transaction. All of this allowed them to maximize their own gain by obtaining the Tenneco Core property for their new investment fund (TVP-1) at a discounted price. The individual Respondents' actions also allowed them to secretly and personally obtain nearly $1.15 million in brokerage commissions to which they were not entitled and which they obtained in flagrant disregard of their fiduciary obligations. Moreover, their violations were part of a pattern that involved several unlawful transactions and two similar attempted transactions (i.e., the attempted sale-and-secret-repurchase of the Glawson tract[79] and the attempted sale of Rocky Forks on which Respondents intended to collect a commission[80]). Collectively, this misconduct demonstrates that the individual Respondents lack the consistent high degree of professional ethics that is required for them to operate as fiduciaries and that their ethical deficiencies could lead to further violations of their fiduciary

---

[76] *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1993)); *see also Vladislav Zubkis*, 2005 WL 3299148, at *5 (Dec. 2, 2005).

[77] The initial decision below reasoned that because the Commission's sanction framework was the basis of "the remedies analysis found wanting in *Johnson*," that framework did not properly consider risk and fitness. But this reflects an incorrect understanding of our sanctions framework and of *Johnson* itself. The Commission's sanctions framework focuses on a respondent's current competence and the degree of risk he poses to public investors and the securities markets. *See also Vladislav Zubkis*, 2005 WL 3299148, at *5.

[78] As we assess the individual Respondents' competence and risk to the public, we believe that scienter is "highly relevant to a determination of whether the defendant has the propensity to commit future violations." *SEC v. Spectrum, Ltd.*, 489 F.2d 535, 542 (2d Cir. 1973). As the Supreme Court explained in *Aaron v. SEC*, when "establish[ing] a sufficient evidentiary predicate to show that such future violation may occur," an "important factor in this regard is the degree of intentional wrongdoing evident in a defendant's past conduct." 446 U.S. 680, 701 (1980).

[79] As discussed earlier, in late 2005, Respondents attempted to sell and repurchase another BellSouth property, the Glawson property. That attempt to sell-and-repurchase BellSouth property failed due to the threat of exposure from a third party.

[80] *See supra* Part III(B)(2).

responsibilities if they are permitted to remain associated with an investment adviser.

Further demonstrating the individual Respondents unfitness and risk to the public is the fact that they have provided absolutely no assurances against future violations; indeed, far from providing such assurances, Respondents' continue to claim that Boden's undisclosed fee "was designed, and did, in fact, benefit New Forestry" and that the "Tenneco Core [sale] provided excellent value to" New Forestry.[81] Our concern about the risk that the individual Respondents pose is increased by the fact that they continue to interact with the investing public and directly control hundreds of millions of dollars of clients' money; all of this would leave them well-placed to repeat their misconduct in the future. Other considerations also lead us to conclude that they lack current competence and pose a risk to the investing public. Respondents have shown no recognition of the wrongful nature of their misconduct or the harm that they caused BellSouth.[82] Further, based on our *de novo* review of the record, we agree with the ALJ's findings that Respondents are "oblivious[] to their fiduciary obligations, which continues today."[83]

Moreover, within the five-year limitations period, the individual Respondents have continued to demonstrate that they pose a substantial degree of risk to the investing public and that they are unfit to be associated with any investment adviser given the sensitive fiduciary role that advisers occupy. As recently as 2012, Respondents falsely described the underlying transactions to BellSouth's successor notwithstanding their fiduciary obligation to act with honesty and utmost good faith toward clients.[84] In addition, throughout 2009 and 2010, the

---

[81]     Timbervest Opening Br. at 3, 6.

[82]     For example, throughout this proceeding Respondents have consistently and brazenly asserted in their briefs that the sale of Tenneco Core "was designed to benefit New Forestry" and that it provided "excellent value" to BellSouth. They have similarly maintained that the "fee arrangement was designed to, and did, in fact, benefit New Forestry."

[83]     As an example, when questioned about the failure to advise BellSouth regarding the use of shell companies, Jones testified in disregard of Respondents' fiduciary obligations that "what was important to Timbervest is what was owed to Mr. Boden, it was paid to Mr. Boden, and that was the end of the story."

[84]     Specifically, although Respondents in 2011 first advised BellSouth's successor in interest—AT&T—about the Commission's investigation, they continued to deny any wrongdoing for months. They also failed during this time to disclose either the brokerage commission payments or the Tenneco Core sale-and-secret-repurchase arrangement. For example, on June 8, 2012, Timbervest's in-house counsel sent AT&T a letter falsely claiming that the brokerage commissions were paid to Boden under a preexisting arrangement; the letter also omitted any mention of the fact that the commissions were paid to shell entities. Similarly, on August 3, 2012, Timbervest's in-house counsel sent another letter to AT&T, but this letter falsely described the Tenneco Core sale and repurchase as independent transactions that were entered into separately.

individual Respondents continued to ignore their fiduciary responsibilities to BellSouth by using the fund's valuable Glawson property without permission and free of charge for their own benefit.[85]  These additional considerations further demonstrate that the individual Respondents are unfit to be associated with an investment advisor and pose a continuing substantial danger to the investing public.[86]

### B.    Cease-and-desist orders are warranted.

Respondents argue that the cease-and-desist orders are precluded by Section 2462 and, in any event, are unwarranted.  We disagree.

As discussed above, it is well established that cease-and-desist orders are "'purely remedial and preventative' and not a 'penalty' or 'forfeiture'" subject to Section 2462.[87]

---

[85]    Specifically, we find that the weight of the evidence demonstrates that during this period Respondents did not disclose to BellSouth that they:  (1) formed a hunting club ("Alcovy Hunt Club") comprised of Boden, Jones, and various Timbervest employees and their families; (2) caused Timbervest (through a vote of the investment committee) to cancel a revenue-generating hunting lease and awarded Alcovy Hunt Club a free one; (3) began holding dove hunts at Glawson, to which Respondents invited prominent members of the Atlanta business community (indeed, going so far as to refer to Glawson as "our farm" in the invitations that Boden sent); and (4) began using Glawson to promote the commingled funds that Timbervest was launching by hosting barbeques and conducting "timber tours."  The various activities for which Respondents used the Glawson property benefitted them personally and represented undisclosed conflicts of interest.

[86]    We appreciate that the underlying violations occurred almost nine years ago.  But we are also mindful that, right up until the period when the Division began to investigate Respondents, they were disregarding their fiduciary responsibilities to BellSouth by using the Glawson property for their own personal benefit.  And the fact that Respondents may have been on their good behavior thereafter during the pendency of the investigation and this proceeding does not assure us that they will adhere to their fiduciary obligations once the spotlight is again off of them.  In any event, the lapse of time must be weighed against the considerations described above that strongly counsel for associational bars here.  We also do not believe that, given the complexity of the fraud, the Division demonstrated unreasonable delay in bringing this action. *See SEC v. First Am. Bank and Trust Co.*, 481 F.2d 673, 682 (8th Cir. 1973) (explaining that injunctive relief under the securities laws is proper where "the very existence of improper conduct in the past raises an inference that such conduct will continue in the future even though the improper conduct has been discontinued"); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972) ("[C]essation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction enjoining violations.").  Respondents' total lack of remorse and their continued pattern of advancing falsehoods in this case also support the issuance of the bars.

[87]    *Riordan v. SEC*, 627 F.3d 1230, 1234 (D.C. Cir. 2010) (quotation omitted); *accord Harding Advisory LLC*, 2015 WL 137642, at *84 (Jan. 12, 2015).

Respondents argue that the imposition of a cease-and-desist order here would be punitive because such an order would have collateral consequences. The only concrete consequence that Respondents identify is their temporary ineligibility for a Rule 506 exemption.[88] But far from rendering a cease-and-desist order punitive, that ineligibility is itself prophylactic.[89]

For essentially the same reasons that we believe the individual Respondents should be barred from associating with any investment adviser, we believe that cease-and-desist orders are appropriate here. In this regard we note that, although the individual Respondents will no longer be permitted to associate with an investment adviser, they will not be barred from associating with other entities in the securities industry and thus they may have future opportunities to commit violations.[90] We believe that cease-and-desist orders could have a beneficial deterrent effect on Respondents to prevent them from committing future securities law violations. Accordingly, we believe that cease-and-desist orders are warranted here.

**C.    Disgorgement of the Tenneco Core disposition fee is warranted.**

We now turn to the issue of the appropriate amount of disgorgement.[91] As BellSouth's investment advisory firm, Timbervest was contractually authorized to receive a onetime

---

[88]    An issuer is disqualified from relying on the exemptions provided by Commission Rule 506(b) and 506(c) of Regulation D if certain covered persons associated with the offering are deemed a "bad actor" under Commission Rule 506(d). *See* 17 CFR 230.506(d). A covered person is deemed a bad actor if, *inter alia*, the person has become subject to a cease-and-desist order in the previous five years due to a violation of "scienter-based anti-fraud provision of the federal securities laws." *Id.* 230.506(d)(v)(A). Among the persons that can qualify as a covered person under Rule 506(d) is any investment manager of an issuer that is a pooled investment fund or a managing member of such investment manager. *Id.*

[89]    *See* Disqualification of Felons and Other "Bad Actors" From Rule 506 Offerings, Securities Act Release No. 9414, 78 FR 44730-01, 44744 (July 24, 2013) (rule promotes investor protection). In any event, whether a sanction is a "penalty" is "not measured from the subjective perspective of the accused" because that standard "would render virtually every sanction a penalty." *Coghlan*, 470 F.3d at 1306. Instead, whether a sanction is a penalty depends on whether a sanction serves the punitive purpose of punishing the defendant for past misconduct as opposed to, as here, serving the remedial purpose of protecting the public interest.

[90]    *See generally SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974) ("One who has displayed such frailty in the past and faces so many temptations in the future may well need the admonition of an injunction to obey the law.").

[91]    The Division did not seek to disgorge the unauthorized brokerage commission payments that Respondents obtained on the sale of Tenneco Core and the Kentucky properties because, after the Commission's investigation began, Respondents reimbursed these amounts to BellSouth.

disposition fee of 3 percent of the gross sales price of any timberlands where the gross sales price was at least 90 percent of the fair market value of the property. Tr. 144. Timbervest received a disposition fee on both the Tenneco Core transaction ($403,500) and the Kentucky property sale ($822,583.50), which the Division now seeks to disgorge.

"Disgorgement is an equitable remedy" that deprives the wrongdoer of ill-gotten gains.[92] Moreover, the amount disgorged must "be a reasonable approximation of the profits causally connected to the violation."[93] And the passage of time does not obviate the public interest in preventing an unjust enrichment.[94]

Applying those principles, we believe that Respondents should disgorge the Tenneco Core disposition fee. Respondents insist there is no causal connection between their misconduct and the Tenneco Core fee because, in their view, Timbervest sold Tenneco Core pursuant to BellSouth's 2005 directive to reduce BellSouth's portfolio. But the weight of the evidence demonstrates that far from selling Tenneco Core for BellSouth's benefit, Respondents sold that property as part of a scheme to secretly acquire it for TVP-1.[95] Moreover, if Respondents had correctly valued Tenneco Core at its approximately $15.5 million fair market value—instead of assigning it an artificially low $12.04 million valuation—Respondents would not have earned a disposition fee on the sale because the $13.45 million sales price was more than 90 percent below Tenneco Core's approximate value. In our view, these considerations more than support the necessary causal nexus to warrant disgorgement of the Tenneco Core disposition fee. And because the individual Respondents collaborated and had a close working relationship in carrying out the misconduct, and they controlled Timbervest, Respondents' liability for the disgorgement and prejudgment interest shall be joint and several.[96]

---

[92]     *Contorinis*, 743 F.3d at 301; *accord Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) (explaining that the purpose of disgorgement is "not to inflict punishment but to prevent an unjust enrichment").

[93]     *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 198); *accord SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir. 2004).

[94]     *See Zacharias v. SEC*, 569 F.3d 458, 471-72 (D.C. Cir. 2009) (holding that Section 2462 does not apply to disgorgement orders).

[95]     In this regard, we note that Tenneco Core was not included on an initial list of proposed 2006 sales that was provided to BellSouth and that Respondents falsely told BellSouth that the sale resulted from an unsolicited offer, when in fact the sale occurred after Boden solicited Wooddall.

[96]     *See, e.g., SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) ("It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct.") (citing *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3rd Cir.1997).

32

By contrast, we believe that the record fails to demonstrate that the Kentucky sale was causally related to Respondents' wrongdoing. Unlike the Tenneco Core transaction, the Division did not present evidence that Respondents' illicit conduct motivated or otherwise caused the Kentucky sale, nor does the Division point to any such evidence now. There is no evidence, for example, that the sale of the Kentucky property was not at fair market value or that it was not undertaken by Timbervest pursuant to BellSouth's 2005 disposition mandate. Thus, we find that the Division has failed to demonstrate a sufficient causal nexus to support disgorgement of the Kentucky property disposition fee.

## V.    Claims of Prejudicial Error

Respondents additionally argue that a number of irregularities occurred in the proceedings and that these warrant a reversal. We disagree.

### A.    Rule 230(b)(2) was not violated.

Respondents assert that the Division violated Rule of Practice Rule 230(b)(2), which provides that the Division may not withhold material from its pre-OIP investigative file that is favorable to a respondent because it is either exculpatory or might be used to impeach witnesses. To establish a violation of Rule 230(b)(2), Respondents must demonstrate that the Division withheld evidence that is favorable to them and that the withheld evidence was material[97]—*i.e.*, that there is a reasonable probability that the evidence's disclosure would have resulted in a different outcome.[98]

Respondents start by alleging that the Division was required to produce notes from its June 2012 interview with ORG's Edward Schwartz. The Division inadvertently produced those notes, but Respondents were required to return them. In Timbervest's opening brief, it claims that the notes demonstrate that when he discussed Boden's fee arrangement with Shapiro in a 2005 phone call, "he was aware that the subject of the fee agreement was Mr. Boden" and that "he gave his approval." As noted above, those

---

[97]    *See, e.g., optionsXpress, Inc.*, 2013 WL 5635987, at *3 (Oct. 16, 2013); *see also John Thomas Capital*, 2013 WL 6384275, at *4-*6 & n.31 (Dec. 6, 2013).

[98]    *optionsXpress, Inc.*, 2013 WL 5635987, at *3. *Accord Kyles v. Whitley*, 514, U.S. 419, 434 (1995) ("A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.") (quotation omitted); *See also Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (materiality requires a showing that "the likelihood of a different result is great enough to undermine [the] confidence in the outcome of the trial") (quotation omitted); *United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008) (materiality requires "a reasonable probability that, had the evidence been disclosed . . . the result of the proceeding would have been different") (quotation omitted); *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002) ("Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin.").

33

statements differ from Schwartz's hearing testimony that the discussion was hypothetical.[99] Nevertheless, we conclude that the notes are not material because, in reaching our determination about liability here, we assumed *arguendo* that Shapiro's account of the conversation was accurate. Yet even giving Shapiro this benefit of the doubt, as discussed above, we found that he made material omissions and misstatements that did not adequately notify BellSouth about Respondents' commissions; for example, the weight of the evidence demonstrates that there was no five-year agreement between Boden and Timbervest, contrary to Shapiro's purported representations to Schwartz.

Respondents also challenge the Division's failure to produce its Wooddall interview notes. In Timbervest's opening brief, they contend that those notes show that "when the Division staff interviewed him in April 2012, Wooddall said that there was an understanding that Timbervest wanted to buy [Tenneco Core] back but that he could not recall any specific price or percentage return." Respondents further contend those statements are inconsistent with Wooddall's hearing testimony that there was an agreement as to price. Even accepting Respondents' characterization of the notes, however, Respondents fail to demonstrate a reasonable probability that the outcome would be different. At most, the notes might show that initially Wooddall did not remember or convey certain details. Even without the notes, Respondents established during Wooddall's testimony that his memory was less than perfect. Most importantly, even accepting Respondents' characterization of the notes, they would not cast any doubt on Wooddall's consistent testimony that Timbervest agreed to repurchase Tenneco Core in advance of the original sale to Chen Timber. And, the totality of the unusual facts and circumstances surrounding the sale and repurchase, in our view, overwhelmingly supports Wooddall's core testimony that Boden had arranged to repurchase Tenneco Core at the time of the original sale to Chen Timber.[100]

### B.     No notice violation occurred.

Respondents also argue that they were forced to litigate claims not listed in the OIP. Under our Rules of Practice, the OIP sets forth a "short and plain statement of the matters" to be determined and, in so doing, defines the "scope" of the administrative proceeding.[101]  We have

---

[99]      *See supra* at III(B)(2).

[100]      In any event, in conducting our *de novo* review of the record, we have separately reviewed the Division's Schwartz and Wooddall interview notes, some of which were filed under seal. Our independent review of those items has not undermined our confidence in the outcome of these proceedings. On that basis, we also deny Respondents' motion to compel production of those notes. We likewise deny Respondents' request to require the Division to produce all other interview summaries of witness who testified at the administrative hearing because Respondents have not even attempted to explain what, if any, material information that they believe those documents contain.

[101]      17 C.F.R. § 201.200(b)(3), (d)(2); *see also Gordon Brent Pierce*, Exchange Act Release No. 71664, 2014 WL 896757, at *12 n.49, *18 (Mar. 7, 2014), *aff'd in relevant part, Pierce v. SEC*, 786 F.3d 1027, 1036 (D.C. Cir. 2015).

consistently held that there is no "right to a disclosure of evidence in advance of the hearing."[102] In particular, although a respondent is entitled to be "sufficiently informed of the nature of the charges against him so that he may adequately prepare his defense,"[103] the OIP is not required to contain a "recital of the evidence which may be introduced at the hearing" to support those charges.[104] In short, the limited function of an OIP is to provide notice of *what* violations of the securities laws are alleged; it need not detail *how* the Division ultimately will try to prove them.

Applying that standard, Respondents' notice-related claims lack merit. The OIP here alleged, among other things, that: (1) "[a]t the time of the initial sale of Alabama property [*i.e.*, Tenneco Core], Boden told [Wooddall] that Timbervest would repurchase the . . . property"; (2) the sale and repurchase occurred through a middleman; (3) the transaction was not disclosed to BellSouth; and (4) the transaction violated the Advisers Act.[105]

Respondents contend that the undervaluation of Tenneco Core should not be considered because the OIP never specifically pleaded that fact. The underlying, "pertinent securities law violation" was and has remained the undisclosed sale-and-repurchase of Tenneco Core in violation of the Advisers Act—which is what the OIP alleged.[106] Although the undervaluation of Tenneco Core is an additional evidentiary data point from which Respondents' motive can be inferred, it is in no sense a new claim or charge. Likewise, to the extent that Respondents raise various arguments about the terminology that the OIP and the ALJ used to describe the Tenneco Core transaction, these arguments have no bearing on our basic conclusion that, regardless of terminology (and consistent with the OIP's underlying allegations), Respondents concealed the round-trip nature of the Tenneco Core transaction. We find that the OIP's allegations sufficiently informed Respondents of the underlying "charge[]" in enough detail to allow [them] to prepare a defense," and so we reject the lack-of-notice claim.[107]

---

[102]    *Adopting Release, Rules of Practice*, Exchange Act Release No. 9795, 1972 WL 125354, at *1 (Sept. 27, 1972) (collecting decisions).

[103]    *Morris J. Reiter*, Exchange Act Release No. 6108, 1959 WL 59479, at *2 (Nov. 2, 1959).

[104]    *Charles M. Weber*, Exchange Act Release No. 4830, 1953 WL 44090, at *2 (Apr. 16, 1953); *accord Rita J. McConville*, Exchange Act Release No. 51950, 2005 WL 1560276, at *14 (June 30, 2005); *Russell Maguire & Co.*, Exchange Act Release No. 3045, 1941 WL 37144, at *2 (Oct. 18, 1941) ("[D]isclosure of evidence is not the function of pleading.").

[105]    *Timbervest, LLC*, Advisers Act Release No. 3678, 2013 WL 5320976, at *2 (Sept. 24, 2013).

[106]    *See Clawson v. SEC*, No. 03-73199, 2005 WL 2174637, at *1 (9th Cir. Sept. 8, 2005) (finding notice sufficient where the facts ultimately found were "consistent with" and "subsumed in" the theory alleged in the OIP).

[107]    *Rita J. McConville*, 2005 WL 1560276, at *14.

We find Respondents' claim to be without merit for the additional reason that, in "administrative proceedings, the standard for determining whether notice is adequate is whether 'the respondent understood the issue and was afforded full opportunity to justify [his] conduct during the course of the litigation.'"[108] "Thus, the question on review is not the adequacy of the [OIP] but is the fairness of the whole procedure," and we may consider post-OIP filings in evaluating whether the respondent had fair opportunity to prepare his or her defense.[109] It was *Respondents' themselves* who opened the door on the undervaluation issue by asserting before the hearing that the sale was a good deal based on Timbervest's valuation methodology.[110] Likewise, there can be no doubt that Respondents had a full opportunity to argue that the Tenneco Core transaction was neither a parking arrangement nor a cross trade: The parties' post-hearing briefs contain extensive discussion of those points. Accordingly, we are satisfied that Respondents had ample notice of how their conduct might be found to have violated the securities laws.

Finally, Respondents contend that they were unaware that their 2005 attempt to sell the Glawson property and their subsequent personal use of that property during the 2009-2010 period would be at issue. It is true that the OIP does not discuss the Glawson property. Yet neither has there been any attempt to find that Respondents committed a securities-law violation in relation to that property. For this threshold reason alone, Respondents' lack-of-notice claim fails; the "scope" of the proceeding has not been expanded. We instead relied upon the Glawson property for two, narrow purposes. *First*, the fact that Timbervest previously tried to carry out a secret sale-and-repurchase of another property bolsters our conclusion that it orchestrated a secret sale-and-repurchase of the Tenneco Core tract (the actual basis for liability).[111] There is no requirement that the OIP preview what evidence the Division would rely upon at the hearing to prove the latter violation.[112] *Second*, Respondents' history with the Glawson property is

---

108    *John P. Flannery*, Exchange Act Release No. 73840, 2014 WL 7145625, at *36 & n.170 (Dec. 15, 2014); *see also Clawson*, 2005 WL 2174637, at *1 (rejecting due-process claim asserting that the Commission found respondent "liable on a theory not alleged in the . . . OIP" where, *inter alia*, the "administrative hearing itself clarified" the matter)

109    *John P. Flannery*, 2014 WL 7145625, at *36 (quotation marks omitted) (citing "multiple letters [filed] with the law judge"). Put another way, although only the OIP—and not any "motion, brief, or other filing"—establishes the charges in the proceeding, *Pierce*, 786 F.3d at 1036, other filings may serve to clarify or elaborate upon, and thus provide additional notice of, the matters in dispute.

110    *See* Division Ex. 74, Timbervest's Wells Submission, at pp. 14, 16-17, 31-36.

111    *Cf.* Fed. R. Evid. 404 (b)(2) (providing that evidence of prior acts is generally admissible for purpose of proving, among other things, common motive, opportunity, intent, and plan).

112    *See, e.g., Rita J. McConville*, 2005 WL 1560276, at *14; *Morris J. Reiter*, 1959 WL 59479, at *2; *Charles M. Weber*, 1953 WL 44090, at *2; *Russell Maguire & Co.*, 1941 WL 37144, at *2.

36

relevant to our public-interest assessment as to what sanctions are warranted.  The OIP specifically placed at issue "[w]hat . . . remedial action is appropriate in the public interest"[113] and we long have held that we may consider circumstances not recited in the OIP in determining whether a sanction is necessary to protect the public.[114]

Respondents' lack-of-notice claim also fails as a factual matter.  The record demonstrates that they had ample notice that the Glawson property would be at issue.  Approximately a month before the hearing began, Respondents learned through the Division's first witness list that the Division could call Reid Hailey as a witness concerning "Respondent's [sic] intent/plan to arrange planned sales . . . and repurchases by entities controlled by Respondents."  Boden solicited Hailey for the failed 2005 Glawson sale-and-repurchase transaction.  Similarly, Respondents cannot object to consideration of their personal use of the Glawson property because they—not the Division—first elicited testimony concerning that use.  Specifically, it was in response to a question from Respondents' counsel during the hearing about Timbervest's performance on behalf of BellSouth that an AT&T official testified "about ... [Respondents] using [Glawson] for their—you know, to advance their position in Atlanta society."[115]  For all

---

[113]    *Timbervest, LLC*, 2013 WL 5320976, at *4.

[114]    *Citizens Capital Corp.*, Exchange Act Release No. 67313, 2012 WL 2499350, at *7 (June 29, 2012) (finding assurances of future compliance undermined by the record evidence of "additional disclosure failures" outside those charged in OIP); *Calais Resources Inc.*, Exchange Act Release No. 67312, 2012 WL 2499349, at *7 n.40 (June 29, 2012) (collecting cases in which the Commission "consider[ed] subsequent filing failures and other matters that fall outside the order instituting proceedings in assessing appropriate sanctions"); *Gateway Int'l Holdings, Inc.*, Exchange Act Release No. 53907, 2006 WL 1506286, at *5 n.30 (May 31, 2006) ("Although we are not finding violations based on those failures, we may consider them, and other matters that fall outside the OIP, in assessing appropriate sanctions."); *see also J. Stephen Stout*, Exchange Act Rel. No. 43410 (Oct. 4, 2000), 73 SEC Docket 1441, 1467 n.64, 2000 WL 1469576, at *16 n.64 (in a matter in which the respondent was found to have engaged in unsuitable and unauthorized trading, the Commission considered respondent's later misconduct, involving his creation of an arbitration scheme, to be relevant in determining that a bar was appropriate).  We note that the Commission at one point did not consider matters outside of the OIP in assessing what sanctions are appropriate, *Int'l Shareholders Servs. Corp.*, [1975-1976 Transfer Binder] Fed.Sec.L.Rep (CCH), ¶ 80,493, Exchange Act Rel. No. 12389 (April 29, 1976), but we have long since rejected that restrictive approach.

[115]    Not only did Respondents open the door to their misuse of the Glawson property at trial, as detailed in the Division's Opposition to Strike Uncharged Allegations, or, in the Alternative, to Introduce Additional Evidence, they followed up on the issue during cross-examination, had a sufficient opportunity to address it more fully if they desired in their case in chief, and never claimed to need additional time to do so.  Thus, respondents' lack-of-notice claim fails for the additional and independent reason that they did not "suffer[] prejudice as a result of the supposed lack of notice." *John P. Flannery*, 2014 WL 7145625, at *36; *see also Clawson*, 2005 WL

the above reasons, we find no merit to their claims.[116]

## C.     Respondents have failed to demonstrate bias.

Respondents claim that the ALJ who presided over the administrative hearing and who issued the initial decision, Cameron Elliot, was biased, but they have failed to meet the standard required to demonstrate bias.

As an initial matter, we note that ALJs are presumed to be unbiased.[117] To overcome that presumption, Respondents must show "that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"[118] There must be a "showing of conflict of interest or some other specific reason for disqualification."[119] "[J]udicial rulings alone," moreover, "almost never constitute a valid basis for a bias [claim]."[120]

As evidence of the ALJ's bias, Respondents cite a number of his decisions in this proceeding, including his findings that Timbervest undervalued Tenneco Core, that Reid Hailey

---

2174637, at *1 (finding that the respondent suffered "no prejudice" when he "failed to identify any additional evidence or defenses he would have proffered had he been given specific notice").

[116]     For the reasons set forth in the Division's December 9, 2014 opposition papers, we also deny Respondents' Motion to Strike Uncharged Allegations, or, in the Alternative, to Introduce Additional Evidence.  Further, with respect to Respondents' contentions about the Division's reliance on evidence of the misuse of the Glawson property during the 2009-2010 period, we note that Respondents' in their post-hearing briefs were plainly on notice that the Division was relying on this evidence to support its sanctions request.  Yet Respondents never moved to submit additional evidence at that time and they have not offered us a reasonable explanation for this failure. *See In the Matter of the Application of Eric J. Weiss*, 2013 WL 1122496, at *9 (March 19, 2013) (party seeking to introduce additional evidence after the initial decision must "show with particularity … that there were reasonable grounds for failing to adduce such evidence previously" (quoting Rule 452, 17 C.F.R . 201.452)).  For this additional reason, we reject their belated request.

[117]     *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

[118]     *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)); *accord Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).

[119]     *Schweiker*, 456 U.S. at 195-96.

[120]     *Liteky*, 510 U.S. at 555; *accord Marcus v. Director, Office of Workers' Compensation Programs*, 548 F.2d 1044, 1051 (D.C. Cir. 1976) ("The mere fact that a decision was reached contrary to a particular party's interest cannot justify a claim of bias, no matter how tenaciously the loser gropes for ways to reverse his misfortune.").

was a credible witness, and that Respondents' claims were unbelievable in certain respects.  But those claims constitute a recitation of the rulings that Respondents disagree with, and disagreement is not evidence of bias.  Moreover, based on our independent *de novo* review, we determined that each of those findings was comfortably supported by the weight of the evidence.  And furthermore, Respondents ignore the various findings and conclusions that favored them, such as the ALJ's erroneous interpretation of 28 U.S.C. § 2462 and the findings (which we believe are contrary to the weight of the evidence) that Boden entered into an oral contract with Shapiro in 2002 and that that Jones and Zell were only negligent with respect to the brokerage commissions.

In support of their claim of bias, Respondents also rely on an article in *Wall Street Journal* that asserts that ALJ Elliot has a record of siding with the Division.[121]  Even if we credit this assertion, this would not show—as required—that the ALJ displayed a clear inability to render fair judgment in this matter.[122]  Though a history of a law judge ruling for an agency may be relevant in assessing bias, that history must be analyzed in the context of the record.[123]  Based on the record in this case, again, Respondents have failed to identify any probative evidence of bias, particularly in light of the overwhelming evidence that they violated Section 206.

Finally, Respondents rely on another *Wall Street Journal* article in which a former ALJ of the Commission alleged that she experienced pressure from the Chief ALJ to rule in favor of the Division during her tenure at the Commission.[124]  Respondents acknowledge that the former ALJ "departed the Commission years before the hearing in this matter," which was presided over by ALJ Elliot.[125]  And far from presenting the requisite, "convincing evidence that 'a risk of actual bias or prejudgment'" is present, Respondents offer only unsupported "speculation or

---

[121]    *See* Jean Eaglesham, *SEC Is Steering More Trials to Judges It Appoints*, THE WALL STREET JOURNAL (Oct. 20, 2014).  *But see* David Zaring, *SEC's In-House Judges Not Too Tough, a Review Shows*, N.Y. TIMES (Aug. 31, 2015).

[122]    Nothing in our decision should be understood to suggest that we agree with the assertions or conclusions in the article.

[123]    *See, e.g., In re IBM*, 618 F.2d 923, 930 (2d Cir. 1980) (explaining that "[i]t seems evident that statistics alone, no matter how computed, cannot establish extrajudicial bias"); *see also Southern Pacific Commc'n Co. v. AT&T*, 740 F.2d 980, 995 (D.C. Cir. 1984) (holding that statistical one-sidedness in rulings cannot, by itself, support an inference of judicial bias).

[124]    *See* Jean Eaglesham, *SEC Wins with In-House Judges*, THE WALL STREET JOURNAL (May 6, 2015).

[125]    The Chief ALJ decided several pre-hearing motions.  However, ALJ Elliot revisited the Chief ALJ's denial of additional *Brady* disclosure, a ruling that we have reviewed *de novo*. *See supra* Part V(A).  Likewise, the Chief ALJ's denial of Respondents' motion for summary disposition is of no consequence given the subsequent trial of the matter before ALJ Elliot. *E.g., Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 130 (2d Cir. 1999).

inference" in attempting to link the former ALJ's allegations to this proceeding.[126]  That is not enough, in our view, to demonstrate bias, nor is it enough to warrant further factual development as to Respondents' claims.[127]  Accordingly, although we accept the *Wall Street Journal* articles for inclusion in the record, we otherwise deny the discovery requests set forth in Respondents' Motion to Allow Submission of Additional Evidence and for Leave to Adduce Additional Evidence filed on May 20, 2015.[128]

## V.    Constitutional Challenges

Respondents make a series of constitutional challenges related to the administrative forum in which this action was brought.[129]  They claim that their hearing before an

---

[126]    *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1360 (6th Cir. 1991).  A showing of actual bias is required to compel disqualification of an ALJ because the "appearance of impropriety standard is not applicable to administrative law judges."  *Bunnell v. Barnhart*, 336 F.3d 1112, 1114 (9th Cir. 2003) (collecting cases).

[127]    *Cf. Attorney General's Manual on the Administrative Procedure Act*, § 6 at p. 73 (1947) ("Hearings are not required on every charge of bias or disqualification . . . .").  The Manual, as "a contemporaneous interpretation [of the APA]," *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 546 (1978), is "give[n] 'considerable weight,'" *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (citation omitted).

[128]    In an abundance of caution, the Chair of the Commission requested that the Office of the Inspector General investigate the bias allegations made in the May 6th *Wall Street Journal* article.  On August 7, 2015, the OIG released an Interim Report of Investigation that we have determined to adduce into the record.  *See* Office of Inspector General, U.S. Securities and Exchange Commission, *Interim Report of Investigation*, Case #15-ALJ-0482-I (Aug. 7, 2015), *available at* http://www.sec.gov/oig/reportspubs/oig-sec-interim-report-investigation-admin-law-judges.pdf.  Based on his interim review of emails and interviews with ALJ Elliot and Chief ALJ Murray, the "OIG has not developed any evidence to support the allegations of bias in ALJs' decisions in the Commission's administrative proceedings."  *Id.* at 4.  Specifically, ALJ "Elliot denied being influenced by anyone on 'how to decide [his] cases or suggest or make [him] biased in any fashion'" and Chief ALJ "Murray stated that there was no merit to the allegations of bias."  *Id.* at 3-4.  The Interim Report of Investigation is probative and Respondents have "not offered any convincing evidence that this report is untrustworthy."  *See, e.g., Perrin v. Anderson*, 784 F.2d 1040, 1047 (10th Cir. 1986) (affirming admissibility of report of internal investigation).  It provides a further basis for our skepticism about the appropriateness and likely utility of additional, open-ended discovery.

[129]    The constitutional claims raised here implicate many "threshold questions" regarding the Commission's rules and practices.  *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2140 (2012); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 214-15 (1994).  In the course of considering the constitutional claims, we address those questions and legal principles.  It is important that the Commission have an opportunity to address constitutional issues in the first instance as it has in the past.  *See, e.g., Gary M. Kornman*, Exchange Act Release No. 59403,

administrative law judge was unconstitutional because of the manner in which the ALJ was appointed and the manner in which he may be removed. Respondents further claim that their rights were violated by the "decision to file this case in [an] administrative forum as opposed to federal court."

Although such wholesale challenges to the Commission's use of administrative proceedings and ALJs are a recent phenomenon, we note that the Commission's use of its administrative forum is not. Administrative proceedings have long been a key feature of the scheme of securities regulation established by Congress. In 1934, for example, Congress authorized the Commission to institute administrative proceedings to expel any member or officer of a national securities exchange "whom the Commission finds has violated" the securities laws.[130] And in 1940, Congress authorized the Commission to bar individuals from acting as investment advisers "if the Commission finds" after an administrative hearing that doing so is "in the public interest."[131] Over subsequent years—and often in response to crises in the financial markets—Congress has expanded those authorities to enable the Commission to more effectively and efficiently protect investors.[132] Congress has also long authorized the use of ALJs throughout the federal government. Congress has empowered "[e]ach agency [to] appoint as many administrative law judges as are necessary," and it has established a comprehensive scheme to govern the details of ALJs' employment in the civil service.[133] The Commission has for many decades relied upon ALJs to prepare initial decisions in its administrative proceedings.[134]

With that background in mind, we turn to Respondents' specific challenges.

---

2009 WL 367635, at *12 (Feb. 13, 2009) (double jeopardy claim); *Vladen Vindman*, Securities Act Release No. 8670, 2006 WL 985308, at *11 & n.60 (Apr. 14, 2006) (Seventh Amendment claim).

[130]     Exchange Act Section 19(a)(3), 48 Stat. 881, 898 (1934).

[131]     Advisers Act Section 203(d), 54 Stat. 851.

[132]     *See, e.g.*, Securities Enforcement Remedies and Penny Stock Reform Act of 1990; Sarbanes-Oxley Act of 2002; Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

[133]     5 U.S.C. §§ 3105, 1101 *et seq.*; 1 U.S.C. § 556 (generally authorizing all agencies to rely on ALJs); *see also* 15 U.S.C. § 78d-1(a) (authorizing the Commission to delegate functions to "an administrative law judge"); Exchange Act Section 4(b), 48 Stat. 885 (original Exchange Act provision authorizing the Commission to appoint "examiners").

[134]     *Cf. Charles Hughes & Co. v. SEC*, 139 F.2d 434 (2d Cir. 1943) (reviewing Commission order revoking broker-dealer registration following proceedings before hearing examiner).

A.     The Appointments Clause does not apply to Commission ALJs.

Respondents argue that ALJ Cameron Elliot—who presided over this matter and issued the Initial Decision—was not appointed in a manner consistent with the Appointments Clause of the Constitution. We find that the appointment of Commission ALJs is not subject to the requirements of the Appointments Clause.

Under the Appointments Clause, certain high-level government officials must be appointed in particular ways: "Principal officers" must be appointed by the President (and confirmed by the Senate), while "inferior officers" must be appointed either by the President, the heads of departments, or the courts of law.[135] The great majority of government personnel are neither principal nor inferior officers, but rather "mere employees" whose appointments are not restricted by the Appointments Clause.[136] It is undisputed that administrative law judge Elliot was not appointed by the President, the head of a department, or a court of law.[137] Respondents therefore contend that his appointment violates the Appointments Clause because, in their view, he should be deemed an inferior officer. The Division counters that he is an employee and thus there was no violation of the Appointments Clause.

As we recently explained,[138] the D.C. Circuit's decision in *Landry v. FDIC* generally controls our resolution of this question.[139] *Landry* held that, for purposes of the Appointments Clause, ALJs at the Federal Deposit Insurance Corporation ("FDIC"), who oversee administrative proceedings to remove bank executives, are employees rather than inferior officers. *Landry* explained that the touchstone for determining whether adjudicators are inferior officers is the extent to which they have the power to issue "final decisions."[140] Although ALJs at the FDIC take testimony, conduct trial-like hearings, rule on the admissibility of evidence, and

---

[135]     The Clause provides that the President "by and with the advice and consent of the Senate, shall appoint . . . officers of the United States . . . but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments." U.S. Const. art. II, §2, cl. 2.

[136]     *Landry v. FDIC*, 204 F.3d 1125, 1134 (D.C. Cir. 2000) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 882 (1991)); *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

[137]     The Commission constitutes the "head of a department" when its commissioners act collectively. *See Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 512-13 (2010).

[138]     *In the Matter of Raymond J. Lucia Companies*, Exchange Act Release No. 34-75837, 2015 WL 5172953, at *21-23 (Sept. 3, 2015).

[139]     204 F.3d 1125 (D.C. Cir. 2000).

[140]     *Landry*, 204 F.3d at 1133-34.

have the power to enforce compliance with discovery orders, they "can never render the decision of the FDIC."[141]  Instead, they issue only "recommended decisions" which the FDIC Board of Directors reviews *de novo*, and "[f]inal decisions are issued only by the FDIC Board."[142]  The FDIC ALJs thus function as aides who assist the Board in its duties, not officers who exercise significant authority independent of the Board's supervision.  Because ALJs at the FDIC "have no such powers" of "final decision," the D.C. Circuit "conclude[d] that they are not inferior officers."[143]

The mix of duties and powers of the Commission's ALJs are very similar to those of the ALJs at the FDIC.  Like the FDIC's ALJs, the Commission's ALJs conduct hearings, take testimony, rule on admissibility of evidence, and issue subpoenas.  And like the FDIC's ALJs, the Commission's ALJs do not issue the final decisions that result from such proceedings.  Just as the FDIC's ALJs issue only "recommended decisions" that are not final, the Commission's ALJs issue "initial decisions" that are likewise not final.[144]  Respondents may petition the Commission for review of an ALJ's initial decision,[145] and it is our "longstanding practice [to] grant[] virtually all petitions for review."[146]  Indeed, we are unaware of any case in which the Commission has not granted a petition for review.  Absent a petition, we may also choose to review a decision on our own initiative.[147]  In either case, our rules expressly provide that "the initial decision [of an ALJ] shall not become final."[148]  Even where an aggrieved person fails to file a timely petition for review of an initial decision and we do not order review on our own

---

[141]    *Id.* at 1133.

[142]    *Id.*

[143]    *Id.* at 1134.

[144]    *See* 17 CFR 201.360(a)(1) & (d).

[145]    17 CFR 201.411(b).

[146]    Exchange Act Release No. 35833, 1995 WL 368865, at *80-81 (June 9, 1995); *see also* Exchange Act Release No. 33163, 1993 WL 468594, at *55-59 (Nov. 5, 1993) (explaining that we are "unaware of any case in which the Commission has declined to grant a petition for review").  We reiterated this policy in the context of amendments to our Rules of Practice in 2004 that eliminated the filing of oppositions to petitions for review.  We deemed such oppositions pointless, "given that the Commission has long had a policy of granting petitions for review, believing that there is a benefit to Commission review when a party takes exception to a decision."  Exchange Act Release No. 48832, 2003 WL 22827684, at *13 (Nov. 23, 2003).

[147]    17 CFR 201.411(c); *see also* 15 U.S.C. 78d-1(b) (providing that "the Commission shall retain a discretionary right to review the action of any . . . administrative law judge . . . upon its own initiative or upon petition").

[148]    17 CFR 201.360(d)(1).

initiative, our rules provide that "*the Commission* will issue an order that the decision has become final," and it becomes final only "upon issuance of the order" by the Commission.[149] Moreover, as does the FDIC, the Commission reviews our ALJs' decisions *de novo*.[150] Upon review, we "may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part," any initial decision.[151] And "any procedural errors" made by an ALJ in conducting the hearing "are cured" by our "thorough, de novo review of the record."[152] We may expand the record by "hear[ing] additional evidence" ourselves or remanding for further proceedings before

---

[149]    17 CFR 201.360(d)(2) (emphasis added). An initial decision does *not* become final simply "on the lapse of time" for seeking review. Exchange Act Release No. 49412, 2004 WL 503739, at *12 (Mar. 12, 2004).

[150]    We do not view the fact that we accord Commission ALJs deference in the context of demeanor-based credibility determinations to afford our ALJs with the type of authority that would qualify them as inferior officers. *First*, as we have repeatedly made clear, we do not accept such findings "blindly," and we will "disregard explicit determinations of credibility" when our *de novo* review of the record as a whole convinces us that a witness's testimony is credible (or not) or that the weight of the evidence warrants a different finding as to the ultimate facts at issue. *Id.* at *10; *accord Francis V. Lorenzo*, Exchange Act Release No. 74836, 2015 WL 1927763, at *10 n.32 (Apr. 29, 2015); *Irfan Mohammed Amanat*, Exchange Act Release No. 54708, 2006 WL 3199181, at *8 n.46 (Nov. 3, 2006); *see also Kay v. FCC*, 396 F.3d 1184, 1189 (D.C. Cir. 2005) ("The law is settled that an agency is not required to adopt the credibility determinations of an administrative law judge."). *Second*, our practice in this regard is no different from the FDIC's and so does not warrant a departure from *Landry*. *Compare [Redacted] Insured State Nonmember Bank*, FDIC-82-73a, 1984 WL 273918, at *5 (June 18, 1984) (stating, "as a general rule," that "the assessment of the credibility of witnesses" by the ALJ is given "deference" by the FDIC) *with Ramon M. Candelaria*, FDIC-95-62e, 1997 WL 211341, at *3-4 (Mar. 11, 1997) (noting that the FDIC ALJ found respondent to be "entirely credible" but rejecting respondent's testimony "in light of the entire record").

[151]    17 CFR 201.411(a); *see also* 5 U.S.C. 557(b) ("On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision . . . ."). In performing its *de novo* review, the Commission relies on staff attorneys that are responsible for advising and assisting the Commission in adjudication matters that are pending before it. These staff members review the administrative record, analyze the factual, legal, and procedural issues raised by the case, and prepare a preliminary draft of the decision for Commission consideration (and otherwise assist the Commission in issuing the decision). The Commission may review, and direct questions to the staff regarding, the underlying record. We understand that this process is comparable to that at many other government agencies where the department head is responsible for adjudicating administrative appeals.

[152]    *Heath v. SEC*, 586 F.3d 122, 142 (2d Cir. 2009); *see also, e.g., Anthony Fields*, Exchange Act Release No. 74344, 2015 WL 728005, at *20 (Feb. 20, 2015) ("[O]ur de novo review cures any evidentiary error that the law judge may have made.").

the ALJ, and may "make any findings or conclusions that in [our] judgment are proper and on the basis of the record."[153]

Respondents attempt to distinguish *Landry* by arguing that the authority of our ALJs is "significantly different" from the authority of the FDIC's ALJs.[154] But the differences Respondents identify are superficial distinctions without substantive difference. They point out that FDIC ALJs issue "recommended decisions," while our ALJs issue "initial decisions"; and litigants can file "exceptions" with the FDIC Board, while here they file "petitions." But these are merely differences in terminology, not substance. The only substantive difference Respondents purport to identify is the fact that the Commission is "not obligated to review all" initial decisions; our power of review is technically discretionary under our rules. The same is true, however, of the FDIC Board, which has discretion to "limit the issues to be reviewed to those findings and conclusions to which opposing arguments or exceptions have been filed by the parties."[155] And in any event, as explained above, we have a longstanding practice of hearing all petitions for review of initial decisions. Thus, whatever power to decline review we may have on paper is not a power we exercise in fact, and such paper authority does not significantly distinguish our ALJs from their counterparts at the FDIC.

Respondents also argue that our ALJs "control the record for review" and "decide[] what is in the record." But that is incorrect, as we have ultimate control over the record. As we have explained before, we have "plenary authority over the course of [our] administrative proceedings and the rulings of [our] law judges—both before and after the issuance of the initial decision and irrespective of whether any party has sought relief."[156] This includes authority over all evidentiary and discovery-related rulings. We are not limited by the record that comes to us. As explained above, we may expand the record. The fact that our ALJs may rule on evidentiary matters and discovery issues (subject to our *de novo* review) does not distinguish them from the FDIC's ALJs in *Landry* who have the same authority.

The Supreme Court's decision in *Freytag v. Commissioner*[157] is not inconsistent with *Landry*. In *Freytag*, the Supreme Court deemed a "special trial judge" of the Tax Court to be an inferior officer. But as *Landry* recognized, ALJs are different from those special trial judges.[158]

---

[153]    17 CFR 201.411(a); 17 CFR 201.452.

[154]    During the oral argument before the Commission, Respondents were expressly asked whether "is it your position actually that *Landry* was wrongly decided or is distinguishable from this situation," and their counsel responded only that "*Landry* is distinguishable."

[155]    12 CFR 308.40(c)(1).

[156]    *Michael Lee Mendenhall*, Release No. 4051 (March 19, 2015), 2015 WL 1247374, at *1.

[157]    501 U.S. 868 (1991).

[158]    *Landry*, 204 F.3d at 1133 (explaining that the special trial judges at issue in *Freytag* exercised "authority . . . not matched by the ALJs").

The greater role and powers of the special trial judges relative to Commission ALJs, in our view, makes *Freytag* inapposite here. *First*, unlike the ALJs whose decisions are reviewed *de novo*, the special trial judges made factual findings to which the Tax Court was required to defer, unless clearly erroneous.[159] *Second*, the special trial judges were authorized by statute to "render the [final] decisions of the Tax Court" in significant, fully-litigated proceedings involving declaratory judgments and amounts in controversy below $10,000.[160] As discussed above, our ALJs issue initial decisions that are not final unless the Commission takes some further action. *Third*, the Tax Court (and by extension the court's special tax judges) exercised "a portion of the judicial power of the United States," including the "authority to punish contempts by fine or imprisonment."[161] Commission ALJs, by contrast, do not possess such authority.[162] And while Commission ALJs may issue subpoenas to compel noncompliance, they are powerless to enforce their subpoenas; the Commission itself would need to seek an order from a federal district court to compel compliance.[163] In this respect, too, our ALJs are akin to the FDIC's ALJs that *Landry* found to be "mere employees."[164]

Based on the foregoing, we conclude that the mix of duties and powers of our ALJs is similar in all material respects to the duties and role of the FDIC's ALJs in *Landry*.[165]

---

[159] *See id.*

[160] *Freytag*, 501 U.S. at 882.

[161] *Id.* at 891.

[162] *See* 17 CFR 201.180. The Commission's rules provide ALJs with authority to punish contemptuous conduct only in the following ways. If a person engages in contemptuous conduct before the ALJ during any proceeding, the ALJ may "exclude that person from such hearing or conference, or any portion thereof," or "summarily suspend that person from representing others in the proceeding in which such conduct occurred for the duration, or any portion, of the proceeding." *Id.* 201.180(a). If there are deficiencies in a filing, a Commission ALJ "may reject, in whole or in part," the filing, such filing "shall not be part of the record," and the ALJ "may direct a party to cure any deficiencies." *Id.* 201.180(b). Finally, if a party fails to make a required filing or to cure a deficiency with a filing, then a Commission ALJ may enter a default, dismiss the case, decide the particular matter at issue against the person, or prohibit the introduction of evidence or exclude testimony concerning that matter." *Id.* 201.180(c). Any such ruling would, of course, be subject to *de novo* Commission review.

[163] *See* 15 U.S.C. § 78u(c).

[164] *See* 12 CFR 308.25(h), 308.26(c), 308.34(c) (providing that an aggrieved party must apply to a federal district court for enforcement of a subpoena issued by a FDIC ALJ).

[165] We do not find any relevance in the fact that the federal securities laws and our regulations at times refer to ALJs as "officers" or "hearing officers." There is no indication that Congress intended "officers" or "hearing officers" to be synonymous with "Officers of the

Accordingly, we follow *Landry*, and we conclude that our ALJs are not "inferior officers" under the Appointments Clause.[166]

## B.     The dual for-cause removal restrictions on Commission ALJs are constitutional.

Respondents next argue that the manner of removing ALJs is unconstitutional in light of the Supreme Court's decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*.[167]  In that case, the Court held that the structure of the Public Company Accounting Oversight Board (PCAOB) was unconstitutional because it "commit[ed] substantial executive authority to officers protected by two layers of for-cause removal."[168]  The PCAOB consisted of inferior officers who exercised executive power, but who could only be removed for cause by principal officers—SEC Commissioners—who themselves could only be removed for cause by the President.[169]  The Court found this "novel structure" contrary to "Article II's vesting of the executive power in the President," including the President's obligation to "ensure that the laws are faithfully executed," because it deprived the President of sufficient control over members of the PCAOB.[170]

Based on *Free Enterprise*, Respondents argue that the Commission's ALJs are unconstitutional because they are likewise protected by two layers of for-cause removal:

---

United States," U.S. Const. art. II, § 2, cl. 2, and the word "officer" in our regulations has no such meaning.  We also note in this regard that the Administrative Procedure Act "consistently uses the term 'officer' or the term 'officer, employee, or agent'" to "refer to [agency] staff members."  Kenneth Culp Davis, *Separation of Functions in Administrative Agencies,* 61 HARV,. L. REV. 612, 615 & n.11 (1948).  *Cf.* 5 U.S.C. §§ 556, 557 (referring to official who presides over evidentiary hearing as the "presiding employee").

[166]     Beyond *Landry*, we believe that our ALJs are properly deemed employees (rather than inferior officers) because this is how Congress has chosen to classify them, and that decision is entitled to considerable deference.  *See Burnap v. United States*, 252 U.S. 512, 516 (1920).  For example, as we discussed above, Congress created and placed ALJ positions within the competitive service system, just like most other federal employees.  Like such other employees, an ALJ who believes that his employing agency has engaged in a prohibited personnel practice can seek redress either through the Office of Special Counsel or the Merit Systems Protection Board.  *See* 5 U.S.C. §§ 1204, 1212, 1214, 1215, 1221.  And ALJs—like other employees—are subject to reductions-in-force.  *See id.* § 7521(b).

[167]     561 U.S. 477 (2010).

[168]     561 U.S. at 505.

[169]     *Id.* at 486-87.

[170]     *Id.* at 505, 496.

Commission ALJs can be removed only for cause by the Merit Systems Protection Board, and members of that board can only be removed for cause by the President.[171] But *Free Enterprise* did not establish a categorical rule prohibiting two layers of for-cause removal wherever it may be found in the Executive Branch. Indeed, the Supreme Court emphasized that the "size and variety of the Federal Government . . . discourage general pronouncements" about what removal structures may, or may not, be constitutional in different situations.[172] Thus, contrary to Respondents' view, *Free Enterprise* did not turn on the technicalities of removal; it turned instead on the core constitutional question of whether "Article II's vesting of the executive power in the President," including his authority to ensure that the laws are faithfully executed, was frustrated by the distinctive structure and features of the PCAOB.[173]

When *Free Enterprise* is so understood, it becomes apparent that "the real question is whether the removal restrictions [at issue] are of such a nature that they impede the President's ability to perform *his* constitutional duty, and the functions of the officials in question must be analyzed in that light."[174] For the reasons explained below, we conclude that ALJs differ from the PCAOB members in a number of significant ways, and those differences obviate any constitutional concerns from the dual for-cause removal restrictions in the context of ALJs.[175]

*First*, the Court in *Free Enterprise* made clear that its "holding . . . does not address that subset of independent agency employees who serve as administrative law judges," and the Court indicated that there would be no separation-of-powers problem if ALJs are deemed to be employees rather than inferior officers.[176] *Free Enterprise* left little doubt that civil servants who are not "executive officers" may enjoy multiple layers of protection from presidential removal without violating the separation of powers. Our conclusion that the Commission's ALJs are employees therefore disposes of Respondents' *Free Enterprise* objection.

*Second*, even if the Commission's ALJs are considered officers, the nature of their duties differs so dramatically from those of the PCAOB as to obviate any potential concerns about the removal limitations. The PCAOB was "charged with enforcing the Sarbanes-Oxley Act, the

---

[171]    *See* 5 U.S.C. §§ 7521, 1202(d).

[172]    561 U.S. at 506.

[173]    *Id.* at 496.

[174]    *Morrison v. Olson*, 487 U.S. 654, 691 (1988) (emphasis added).

[175]    Courts that have addressed the question have agreed that the limitations on removal of Commission ALJs are not unconstitutional. *See Duka v. SEC*, 2015 WL 1943245, at *8-10 (S.D.N.Y. Apr. 15, 2015) (finding no likelihood of success on removal issue); *Hill v. SEC*, 2015 WL 4307088, at *19 n.12 (N.D. Ga. June 8, 2015) (expressing "serious doubts" that the removal restrictions are unconstitutional).

[176]    *Free Enterprise*, 561 U.S. at 507 n.10.

48

securities laws, the Commission's rules, its own rules, and professional accounting standards," among other duties.[177]  It was "empowered to take significant enforcement actions" and engage in the "daily exercise of prosecutorial discretion"—all core "executive activities typically carried out by officials within the Executive Branch."[178]  In contrast, as the Court in *Free Enterprise* recognized, ALJs are "unlike members of the Board" insofar as they "perform adjudicative rather than enforcement or policymaking functions"[179]—and limited adjudicative power at that.  And the exercise of such "adjudicative" functions beyond presidential control has long been deemed constitutionally permissible.[180]

 *Third*, even if the Commission's ALJs were empowered to exercise the kind of power that the Constitution requires the President to control, removal would be only one of many means of control.  *Free Enterprise* acknowledged that one level of for-cause removal was permissible.[181]  But two levels of for-cause removal were problematic *in that case* because "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the Board."[182]  As *Free Enterprise* observed, the PCAOB had "significant independence in determining its priorities and intervening in the affairs of regulated firms (and the lives of their associated persons) without Commission preapproval or direction."[183]  Our ALJs are very different, as they merely take the cases that come to them after we initiate an administrative proceeding, and every one of their decisions can be revisited in the course of our *de novo* review.  Nor are we even required to delegate functions to ALJs in the first place.[184]

---

[177]     *Id*. at 485.

[178]     *Id*. at 504; *see also id*. at 485 (explaining that the Board has "expansive powers to govern an entire industry").

[179]     *Id*. at 507 n.10.

[180]     *See Humphrey's Executor v. United States*, 295 U.S. 602, 627-8 (1935) (explaining that a "judicial aid" who acts in an adjudicative capacity "cannot in any proper sense be characterized as an arm or an eye of the executive"); *Weiner v. United States*, 357 U.S. 349 (1958) (upholding war claims commission over which the President had no power of removal).  *Morrison* is not to the contrary.  The Court there did "not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant"—only that the functions "must be analyzed in th[e] light" of "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty."  487 U.S. at 691.

[181]     561 U.S. at 501; *see also Humphrey's Executor*, 295 U.S. at 602.

[182]     *Free Enterprise*, 561 U.S. at 496.

[183]     *Id*. at 504-05.

[184]     *See* 15 U.S.C. § 78d-1(a).

*Fourth*, unlike the structure of the PCAOB, the ALJ system is not novel and has been in place for over 70 years. The Court emphasized in *Free Enterprise* that "[p]erhaps the most telling indication of the severe constitutional problem with the [PCAOB] is the lack of historical precedent for this entity."[185] But the ALJ system and the tenure protections ALJs enjoy have been in place since the Administrative Procedure Act was enacted in 1946. This system is not an unusual innovation, but rather a system that has been working effectively for almost 70 years. Unlike in *Free Enterprise*, the challengers here are the ones advocating for radical change. When persons within an independent agency perform adjudicative functions, they are "to be nonpartisan; and [they] must, from the very nature of [their] duties, act with entire impartiality."[186] A system in which adjudicators are brought more directly within the President's control could undermine that impartiality. We do not believe such a result is compelled by *Free Enterprise*, nor do we believe that it would be wise. [187]

Accordingly, we reject Respondents' challenge to the dual for-cause removal limitations on Commission ALJs.

## C.    Respondents did not experience an equal protection violation.

Respondents claim that the Commission's "decision to file this case in its administrative forum as opposed to federal court" violated their constitutional rights to equal protection of the laws.[188] In asserting this claim, Respondents do not allege that they have been singled out because of their membership in any particular class or group. Nor do they dispute that the Commission has statutory authority to institute administrative proceedings against them under the Advisers Act and the Investment Company Act of 1940. Instead, Respondents contend that the Commission's discretionary choice of an administrative forum disadvantages them relative to similarly situated individuals whose cases are brought and adjudicated in federal court. We reject this claim for three reasons.

---

[185]    561 U.S. at 505 (quoting Judge Kavanaugh).

[186]    *Humphrey's Executor*, 295 U.S. at 624; *see also Wiener*, 357 U.S. at 354 ("one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will") (quoting *Humphrey's Executor*, 295 U.S. at 629).

[187]    We also note that the standard for removing Commission law judges differs from the "unusually high standard" that was applicable to the PCAOB in *Free Enterprise*. *Id*. at 503. The Board members could only be removed for "willful violations of the Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance." *Id*. This is different from an "ordinary dual for-cause standard," *id*. at 502, like the one that governs ALJs, *see* 5 U.S.C. § 7521(a).

[188]    *See generally Washington v. Davis*, 426 U.S. 229, 239 (1976) (explaining that "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups") (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

*First*, Respondents' claim is not legally cognizable.  Respondents rely on *Village of Willowbrook v. Olech*, which held that someone who does not allege membership in a particular class may assert a "class-of-one" equal protection claim by establishing that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[189]  But the Supreme Court has subsequently made clear that *Olech*, which involved a landowner's challenge to a zoning decision, does not apply to every kind of government action.  In *Engquist v. Oregon Department of Agriculture*, the Court explained that there "are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."[190]  In such cases, "treating like individuals differently is an accepted consequence of the discretion granted," and "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise."[191]

The Commission's choice of forum is such a discretionary decision.  Congress gave the Commission authority to initiate administrative proceedings, as well as to bring civil actions in federal court.[192]  The Commission's choice to use either or both of those means to enforce the securities laws is a matter of broad agency discretion.[193]  Such a decision depends on a highly individualized assessment of the facts and circumstances of a given case.  Moreover, Respondents cite no decision from any court finding that a class-of-one claim can be used to challenge the government's choice of forum.  And in an analogous case, at least one federal court of appeals has held that "the discretion conferred on prosecutors choosing whom and how to prosecute" precludes a class-of-one claim.[194]  The defendant in that case objected to the fact that he was prosecuted in federal court, while allegedly similarly situated defendants were prosecuted in state court.  But the appeals court rejected his class-of-one claim because the "logic [of *Engquist*] is equally applicable to the exercise of prosecutory discretion," where "there is no readily apparent standard" against which to measure a prosecutor's charging decision and the decision "is solely for the executive branch to make without fear of second-guessing by the

---

[189]      528 U.S. 562, 564 (2000).

[190]      553 U.S. 591, 594 (2008) (holding that "a 'class-of-one' theory of equal protection has no place in the public employment context").

[191]      *Id.*

[192]      *See* 15 U.S.C. §§ 80b-3, 80b-9.

[193]      *See* 17 CFR 201.5(b) ("After investigation or otherwise the Commission may in its discretion take one or more of the following actions: Institution of administrative proceedings . . . , initiation of injunctive proceedings in the courts, . . . .").

[194]      *United States v. Moore*, 543 F. 3d 891, 901 (7th Cir. 2008).

judiciary."[195]  The same is true with respect to the Commission's choice of forum in pursuing a civil enforcement action for a violation of the securities laws.

*Second*, even if Respondents' class-of-one claim were cognizable, they fail to make the threshold showing that they have been "treated differently from others similarly situated."[196] Persons asserting a class-of-one claim "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."[197]  But Respondents allege only vaguely that the Commission "has brought cases, including cases against investment advisers in federal court," citing just one example of a case that "concerned violations of Advisers Act Sections 206(1&2)."  The mere fact that another case involves the same provisions of the Advisers Act does not demonstrate that Respondents are being treated differently from others similarly situated for purposes of equal protection.[198]

*Third*, Respondents have failed to establish that "there is no rational basis for the difference in treatment."[199]  Respondents speculate that the Commission's "motive is to disadvantage Respondents in their defense of this matter and to compel settlements," but there is no basis for this allegation.  Nor do Respondents even attempt to substantiate their claim "by 'negativing every conceivable basis which might support' the government action."[200]  And they could hardly do so, as a choice of venue made even "solely for reasons of administrative convenience" is within the bounds of prosecutorial discretion.[201]  Here, for example, it was particularly rational to pursue this enforcement matter in the administrative forum because the proceedings involved a request for an associational bar; had the Commission pursued this action in district court in the first instance, a follow-on administrative proceeding would have been

---

[195]      *Id.* at 900-01; *see also United States v. Green*, 654 F.3d 637, 650 (6th Cir. 2011) (rejecting a class-of-one claim premised on "government's decision to prosecute [the defendant] under MEJA in the civilian justice system while prosecuting his coconspirators under UCMJ in the military justice system").

[196]      *Olech*, 528 U.S. at 564.

[197]      *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

[198]      *See Chau v. SEC*, 72 F. Supp. 3d 417, 435 n.148 (S.D.N.Y. Dec. 11, 2014) ("This Court … has serious doubts about whether plaintiffs' 'superficial comparisons' are sufficient to allege plausibly a 'class of one' claim, particularly as to the SEC's discretionary choice of the forum in which to bring charges.").

[199]      *Olech*, 528 U.S. at 564.

[200]      *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 n.6 (11th Cir. 2006) (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

[201]      *Moore*, 543 F. 3d at 899.

52

necessary to consider the associational bar. By bringing this proceeding in the administrative forum in the first instance, an additional step in the final resolution of the claims was eliminated.

For the foregoing reasons, we reject Respondents' equal protection claim.

## VI.    Conclusion

For the reasons explained above, we find that Timbervest violated Sections 206(1) and 206(2) of the Advisers Act, and that the individual Respondents, acting with scienter, aided, abetted, and caused those violations.

An appropriate order will issue.[202]

By the Commission (Chair WHITE and Commissioners GALLAGHER, STEIN, and PIWOWAR); Commissioner AGUILAR not participating.

Brent J. Fields
Secretary

---

[202]    We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion. Finally, any pending motions not expressly addressed in this opinion are denied as moot.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 4197 / September 17, 2015

INVESTMENT COMPANY ACT OF 1940
Release No. 31830 / September 17, 2015

Admin. Proc. File No. 3-15519

In the Matter of

TIMBERVEST, LLC,
JOEL BARTH SHAPIRO,
WALTER WILLIAM ANTHONY BODEN, III,
DONALD DAVID ZELL, JR., and
GORDON JONES II

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Joel Barth Shapiro, Walter William Anthony Boden, Donald David Zell, Jr., and Gordon Jones II be barred from association with any investment adviser; and it is further

ORDERED that Timbervest, LLC, Joel Barth Shapiro, Walter William Anthony Boden, Donald David Zell, Jr., and Gordon Jones II cease and desist from committing or causing any violations or future violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940; and it is further

ORDERED that Timbervest, LLC, Joel Barth Shapiro, Walter William Anthony Boden, Donald David Zell, Jr., and Gordon Jones II disgorge, jointly and severally, $403,500, plus prejudgment interest of $181,814.05, such prejudgment interest calculated beginning from November 1, 2006, with such interest continuing to accrue on all funds owed until they are paid, in accordance with Commission Rule of Practice 600.[1]

Payment of the amounts to be disgorged (and the prejudgment interest thereon) shall be (i) made by United States postal money order, certified check, bank cashier's check, or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) mailed to the Enterprises Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, 6500 South

---

[1]      17 C.F.R. 201.600.

MacArthur Blvd., Oklahoma City, OK 73169; and (iv) submitted under cover letter that identifies the respondent and the file number of this proceeding. A copy of the cover letter and instrument of payment shall be sent to the Commission's Division of Enforcement, directed to the attention of the counsel of record.

By the Commission (Chair WHITE and Commissioners GALLAGHER, STEIN, and PIWOWAR); Commissioner AGUILAR not participating.

Brent J. Fields
Secretar

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TIMBERVEST, LLC, JOEL BARTH )
SHAPIRO, WALTER WILLIAM )
ANTHONY BODEN, III, DONALD )
DAVID ZELL, JR., and GORDON )
JONES II, )
)
)
Petitioners, )
)
v. )
) Case No. 15- 15-1416
)
UNITED STATES SECURITIES AND )
EXCHANGE COMMISSION, )
)
Respondent. )
)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 16.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Timbervest, LLC ("Timbervest") hereby files this Disclosure Statement in connection with the Petition for Review filed concurrently herewith.

Timbervest is a Georgia limited liability company. Timbervest is owned by Ironwood Capital Partners, LLC ("Ironwood"). Ironwood is owned by petitioners Joel Barth Shapiro, Walter William Anthony Boden III, and Donald David Zell, Jr. No publicly held corporation owns 10% or greater ownership interest in Timbervest.

Dated: November 13, 2015


Stephen D. Councill                          Nancy R. Grunberg
Julia Blackburn Stone                        George Kostolampros

ROGERS & HARDIN LLP                          DENTONS US LLP
2700 International Tower, Peachtree           1900 K Street, N.W.
Center                                       Washington, D.C.  20006
229 Peachtree Street, N.E.                   Telephone:  202-496-7524
Atlanta, GA  30303                           Facsimile:  202-496-7756
Telephone:  404-522-4700                     nancy.grunberg@dentons.com
Facsimile:  404-525-2224                     george.kostolamproas@dentons.com
scouncill@rh-law.com
jstone@rh-law.com                            *Counsel for Petitioners*

*Counsel for Petitioners*